JAMES T. JETHROE *v.* STATE OF INDIANA.

[No. 1173S229. Filed November 19, 1974. Rehearing denied February 4, 1975.]

George A. *Purvis*, of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert F. Colker,* Assistant Attorney General, for appellee.

DEBRULER, J.—Appellant, James T. Jethroe, was indicted for the crime of First Degree Murder. (IC 1971, 35-13-4-1, being Burns § 10-3401). After a trial by jury in the Marion Criminal Court, Judge Harold Kohlmeyer presiding, he was convicted of the crime of Second Degree Murder (IC 1971, 35-1-54-1, being Burns § 10-3404). Appellant was sentenced to imprisonment for life. He has perfected an appeal to this Court on three grounds: (1) The verdict is not supported by sufficient evidence; (2) The trial court erred in admitting the testimony of a daughter of the deceased concerning a telephone conversation between deceased and appellant's mother; (3) The trial court erred in admitting testimony and a demonstration by appellant concerning the loading, unloading and reloading of a shotgun.

Certain evidence at the trial was introduced without contradiction. Appellant had lived in the same house as LaDonna Roundtree, the deceased, and her children for about two years. Jethroe and LaDonna quarreled sometimes, and Jethroe had struck her on several occasions. The deceased was killed on August 2nd, by a shot in the head from a shotgun held by appellant. One of the deceased's daughters was present when the shooting occurred. Appellant admitted to the man whom he asked to telephone the police and to the officer who answered the call that he was the person who had killed LaDonna.

The only eye-witness and the appellant presented two different explanations of the events leading up to the shooting. Diane Roundtree, the fourteen year old daughter of the deceased, testified:

"A. And then he [appellant] came back into the house and he had the shotgun with him and then I started staring at him and so, you know, he went into that front room. . . .

\* \* \*

A. And then he started doing something with the shotgun . . . and he went up and got by the stereo and he played a record.

\* \* \*

A. And he played the record 'I heard it through the grapevine'. . . . I remember he said 'You listen to this; listen to this' and momma said 'listen to what' and you know, he played the record, and then he—and then you know, he raised up the shotgun and I said 'Jethroe please don't shoot her' you know, I was begging him not to shoot her, and so he shot once and he missed and it went into the ceiling I guess and I was crying and holding my neice and I was crying and then he said, he told momma, 'You don't believe I will kill you' and then momma, she said 'Jethroe, yes I believe you will kill me' and so then momma she sat there and then she said 'Jethroe, go ahead and shoot me' and then he shot her and then she started bleeding."

The appellant testified about the same time period:

"A. Well when I sat down in that chair by the stereo see, well Diane she came back and sat in the same chair she was sitting in. Actually, we was just about facing each other . . . I was sitting in this room and Diane was sitting in that room, so LaDonna, she come and stood in the kitchen door . . . and I was just sitting in there, you know, I was looking at her and then when she moved her hand I saw the knife, you know and I said, 'hey, what are you going to do with that knife?' and she said 'I told you you weren't going to pay that light bill, that you was hustling for Crown Hill Cemetary' just like that. I said 'wait a minute, LaDonna, you got to be kidding' just like that, so she said, 'I told you you wasn't going to pay that light bill' so she started out of the kitchen, you know, so I gets up and walks back over by the fireplace. . . . I was standing

right there so she started that way, see, and I reached and got the shotgun and I pulled it out so that she could see it, you know, and she looks at me and argues a little more, and she started toward me so I shot in the wall, you know, beside her—I shot in the wall beside her, so she stops and she stood up there and she argues and she argues and she argues and I was standing up there with a shotgun in my hand, so I unloaded the shotgun and put another shell in and I sits back down in that chair by the stereo so at the present time LaDonna, she stood up there and she argues and she said, 'well Jethroe regardless of everything, if you do anything, don't mess with none of my kids' and I said 'LaDonna I am not trying to do anything with you or your kids either one.' I said 'I am not going to let you come up on me with that knife' and so all of a sudden she made a break like she was going to run over there so that is when I went up to get up see, and as I was—getting up, see, the gun went off and LaDonna fell back.

Q. Fell back in the chair?

A. Yea."

As an appellate court, we must not weigh the evidence presented to the trial court or decide questions concerning the credibility of the witnesses. It is the jury who sees and hears the witnesses and who can best determine which evidence is credible and most convincing. We must accept the evidence which supports the jury's verdict and determine whether that evidence, along with the reasonable inferences a jury might draw from it, is of sufficient probative value to establish all the necessary elements of the offense charged. *Lynch* v. *State* (1974), 262 Ind. 360, 316 N.E. 2d 372.

A verdict of Second Degree Murder requires a finding that defendant "purposely and maliciously, but without premeditation" killed a human being. Burns § 10-3404, *supra*. Appellant questions the sufficiency of the evidence to sustain the jury's verdict. Prior to considering this question we turn to appellant's contentions that evidence was erroneously admitted at trial.

His first contention is that the testimony of Diane Round-tree, age fourteen, ought not to be admitted because she is forgetful and because her testimony may have been influenced by deceased's mother. It is well established that any person ten years of age or older is competent to testify in a criminal case. IC 1971, 35-1-31-3, being Burns § 9-1603, with reference to IC 1971, 34-1-14-5, being Burns § 2-1714. Appellant had the burden of establishing that Diane was not competent. *Wedmore* v. *State* (1957), 237 Ind. 212, 143 N.E.2d 649. Her credibility was to be determined by the jury.

Appellant's second argument is that the admission of the testimony of LaBerta Roundtree, another daughter of deceased, was improper. This witness testified about events occurring on the day of the fatal shot:

"Q. Do you know if she ever asked Mr. Jethroe's mother to come and move him out?
A. Yeah.
Q. Do you recall when that was?
A. That was on August 2nd.

\* \* \*

A. She called his mother on the telephone.
Q. I see, and did you hear the conversation?
A. Yeah.
Q. Was Mr. Jethroe in the room?
A. Yeah.

\* \* \*

Q. How far away would you have been from your mother at that time?
A. . . . I was sitting next to her.

\* \* \*

Q. How do you know she was talking to Mr. Jethroe's mother?
A. Well you see, when she was talking to her she called, I guess she called her name, I think.
Q. She called her by name and what did your mother say to Mrs. Jethroe—or Mr. Jethroe's mother?
*Mr. Shaw:* I am going to object Your Honor unless

she can specifically state she knew this was Mrs. Jethroe on the other end.

*Mr. Hardy:* Your Honor, the witness just said she called her by name.

*Mr. Shaw:* She said she thought she would call her by name, Your Honor.

*Court:* Overrule the objection.

Q. Go ahead, you can answer that question.

A. When they was first talking she told Jethroe's mother, she said 'Jethroe said he is going to kill me before Friday' and she said she didn't know why Jethroe was doing her like this because she tried every way to be nice to him and she helped him get a job and everything and then Jethroe snatched the telephone from her and then he talked to his mother on the phone and told her not to come out there."

On appeal, counsel for appellant argues that this testimony was inadmissible as hearsay. However, counsel for the State contends that the testimony was not hearsay because it was presented for the purpose of establishing the fact that deceased was talking to appellant's mother and that appellant was present and heard the conversation.

Trial counsel for appellant did not object to the question or deceased's statement on hearsay grounds. His objection on the ground that the witness had not positively identified the person to whom the deceased was speaking on the phone was not pertinent in this context. The witness was present and heard the statements first hand, so that the fact that the speaker was making the statements into the telephone was incidental. Contrast cases where the identity of the person on the phone is crucial. *U.S.* v. *Platt* (7th Cir. 1970), 435 F.2d 220; *U.S.* v. *Hickman* (7th Cir. 1970), 426 F.2d 515. Here, a correct understanding of the statements did not depend upon knowing who was on the other end of the line.

Appellant's failure to present a hearsay objection was material, because his objection did not give the trial court notice of the real weakness of the testimony. The failure to object on a specific ground is generally con-

sidered a waiver of the right to rely on such ground on appeal from the trial court's ruling on the objection. *Jones* v. *State* (1973), 260 Ind. 463, 296 N.E.2d 407, 409-10; *Dudley Sports Co.* v. *Schmitt* (1972), 151 Ind. App. 217, 279 N.E.2d 266, 279. An exception to this requirement of specificity exists where the objection is made under such circumstances that it is clear that the trial judge considered the unspecified ground in making his ruling. Such an exception does not obtain here. The hearsay ground should be considered waived; however, the State has not urged waiver in its brief, and therefore we choose not to rely upon it.

In its brief the State raises as an answer to the hearsay claim, that the testimony was presented at trial for a limited purpose only. When as here the jury received no limiting instruction, the assumption must be that the jury considered the testimony as evidence of the truth of the matters asserted in that testimony. Consequently, counsel for the State cannot assert a limited use of the telephone conversation at the appellate level.

Hearsay evidence is testimony by a witness in court relative to an extra judicial declaration by another, which is offered to prove the truth of the facts asserted by the declarant. The value of the witness' statement rests on the credibility of the declarant, and the declarant is not in court available for cross examination. *State* v. *Harvey* (1971), 256 Ind. 473, 476, 269 N.E.2d 759, 760.

Deceased's conversation was introduced to show the truth of her assertion that appellant had threatened her. Nevertheless, it was admissible, because of the hearsay exception for admissions. An admission is an out-of-court statement made by a party and introduced in court by a party opponent. 4 Wigmore, EVIDENCE § 1048 (Chad. Rev. 1972). Obviously, the party is not denied his Sixth Amendment right to confront the witnesses against him, when the out-of-court declarant was himself.

It is the admissions exception which would have allowed into evidence Jethroe's alleged threat to LaDonna, *if* the witness had heard him threaten her. In the case before us, the witness LaBerta did not hear Jethroe threaten LaDonna. However, LaBerta testified that she was present when Jethroe overheard the deceased relate his threats over the phone. LaBerta testified that she saw Jethroe "snatch" the phone from the deceased and tell the person on the line not to come over to their house. LaBerta's testimony about the deceased's statement, when considered alone, was hearsay and properly would be excluded. But because defendant was present at the time the statement was made, and his statement and conduct were equivocal, the accusation and the reply were admissible as a tacit or adoptive admission. McCormick, EVIDENCE §§ 270, 161 (2d ed. 1972) ; 4 Wigmore, EVIDENCE § 1071 (Chad. Rev. 1972).

In *Diamond* v. *State* (1924), 195 Ind. 285, 144 N.E. 466, several witnesses heard defendant's dying wife repeatedly accuse him of killing her. He denied her accusations and asked her to accuse another person; yet once he said that he did not mean to kill her. Defendant insisted that the testimony of the witnesses was inadmissible hearsay. The court determined:

> "If the whole conversation had consisted of a charge by the wife and a denial thereof by the appellant, unaccompanied by an implicative act, her statement would not have been competent. . . .
>
> * * *
>
> The statements made by Mrs. Diamond were not evidence of the truth of the facts stated, but were only competent to explain and account for appellant's conduct and statements. Upon proper request it would have been the duty of the court to instruct the jury regarding the purposes of such testimony." 195 Ind. at 294-95.

Because defendant's conduct was not an unequivocal denial of his wife's accusations, her statements were admissible with his replies and conduct as an admission. The *Diamond* case provides the clearest example of inadmissible hearsay state-

ments which are inextricably related to defendant's equivocal replies and become admissible as part of an admission.

In *Robinson* v. *State* (1974), Ind. App., 309 N.E.2d 833, the witness had heard voices which he identified as those of defendant's mother and defendant in the following exchange:

> "You shouldn't have thrown the baby against the wall. You were beating him too hard.
> Shut up." 309 N.E.2d 837.

The Court explained:

> "The 'charge' quite clearly is hearsay. Standing alone it is not admissible (unless it does happen to be a part of the res gestae). It is the defendant's reaction to the charge which is admissible *if* it constitutes either a clear admission of the truth of the charge or a failure to deny (when the circumstances are such that the person accused would be expected to deny)." 309 N.E.2d at 840-41.

An equivocal response renders the charge and the response admissible. The Court interpreted "shut up" to be equivocal.

The Court went on to discuss the significance of admitting the evidence:

> "The danger involved in allowing a jury to hear evidence consisting of a hearsay accusation and an equivocal reply by the accused is that the hearsay, rather than the defendant's reply to it may convince the jury that defendant is guilty—even when the jurors understand the response as a denial." 309 N.E.2d at 841.

The defendant should ask for instructions to the effect that, if the jury finds defendant's response to be a denial, they should ignore the testimony entirely.

This exception to the hearsay rule is limited to testimony about conversations heard by the witness which involved admissions or equivocal answers by defendant. The witness who is testifying must have seen or heard the defendant's reaction to the hearsay accusations himself. In *Tenta* v. *Guraly* (1966), 140 Ind. App. 160, 221 N.E.2d 577, the witness testified that deceased had said that appellant said that the contract between

witness and the deceased was unimportant. The witness had not heard appellant say that, and appellant was not present when the deceased told the witness. The testimony was inadmissible because (1) witness lacked personal knowledge of appellant's declaration that the contract was unimportant, and (2) the later conversation incorporating this declaration was not an admission, since defendant was not present to equivocate or admit her statement.

The circumstances in *Harvey* v. *State, supra,* were similar. Witness testified that a third party had told him that defendant had admitted that he might have murdered the deceased. Under the special exception for conversations involving defendant's admissions or equivocations, the third party would have been allowed to testify about the content of the conversation which he had overheard. However, the witness could not testify under that exception because he never saw or heard defendant make any admissions or equivocations. Witness and defendant were not together (1) when defendant made his admission in the first place, or (2) when the third party related this earlier incident to the witness.

In the case before us, appellant and witness were present together at the time appellant heard and equivocally reacted to deceased's statements, so that there was no error in admitting this evidence.

Appellant argues that that conversation tended to show malice and premeditation, whereas, he says, the record indicates self-defense or an act in a sudden heat. However, the jury did not find appellant guilty of first degree murder, that is, the jury was not convinced beyond a reasonable doubt that appellant's act was premeditated. A verdict of Second Degree Murder requires proof beyond a reasonable doubt of malice and purpose. We believe that the other evidence of threats, beatings, and a first shot into the wall was sufficient for the jury to find malice and purpose.

Appellant's final contention is that his demonstration of the loading, unloading, and reloading of his shotgun at the State's

request was not relevant to the issues and served only to excite the minds and inflame the passions of the jury.

The State asked on cross-examination:

"Mr. Jethroe, is [sic] I were to hand you state's Exhibit 17 would you show the jury the mechanics of loading, unloading and re-loading this gun please?"

Defendant's counsel objected:

*"Mr. Shaw:* Your Honor, I am going to object to that. I think if he wants to qualify Mr. Jethroe as an expert with regard to guns, but I don't believe he has done so. I object on that basis and I also object on the basis if he is trying to show how this gun loaded today as with reference to another day, he can load the gun in many ways. If he loads it one way today, that doesn't mean he did it that way another day.

*Court:* Overruled.

Q. Would you step down here in front of the jury Mr. Jethroe and show the Court the way you would do this. I would like to see how you would load that gun, how you would reject the spent shell after you fired it, and how you would re-load it.

A. Like if I was going to shoot quick.

Q. Yeah."

The State could introduce into evidence the shotgun which killed the deceased. On direct, appellant's counsel had asked appellant to show the jury how he had held the shotgun for the first shot and how the gun was positioned for the second shot. From the record, it appears that appellant did so without holding the shotgun itself. The State then asked appellant to demonstrate with the shotgun how it was loaded and unloaded, down in front of the jury. It is not clear what the jury was to learn from this experiment. The parties agreed that the appellant had loaded and reloaded the shotgun in a short period of time. Only because the defense had had appellant act out his use of the gun in order to show that the second shot was accidental, will we condone the State's requiring the appellant to handle the weapon in front of the jury.

Finding no error, we affirm the judgment of the trial court.

Arterburn, C.J., Givan, Hunter and Prentice, JJ., concur.

NOTE.—Reported at 319 N.E.2d 133.