**Larry JOHNSON, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

No. 984S362.

Supreme Court of Indiana.

May 21, 1987.

Rehearing Denied July 21, 1987.

Robert Canada, Evansville, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Larry Johnson was found guilty by a jury in the Vanderburgh Superior Court of possession of cocaine, a class D felony. Appellant was also found to be a habitual offender. The trial court sentenced Appellant to two (2) years for possession of cocaine, enhanced by thirty (30) years for the habitual offender finding, for a total term of thirty-two (32) years. Appellant raises two issues for our consideration in this direct appeal:

1.  destruction of evidence by the Police Department; and

2.  improper entry of judgment.

On March 2, 1984, Appellant Larry Johnson was arrested on an outstanding theft warrant by Detective John Zirkelbach of the Evansville Police Department. Appellant was searched for weapons at the time of his arrest, handcuffed, and taken to the Evansville Police Department Headquarters. Defendant informed Zirkelbach that he had some type of arrangement with Sergeant Sprinkle, also of the Evansville Police Department, and that he wished to speak with Sprinkle. Zirkelbach telephoned Sprinkle but Sprinkle informed

Zirkelbach he and Appellant had no such arrangement, and Zirkelbach should lock up Appellant.

Immediately after Zirkelbach telephoned Sprinkle, Zirkelbach took Appellant to the booking lobby, booked him on the outstanding theft warrant and searched him in order to determine what property he had on his person so that it could be placed in a property envelope for Appellant's protection. Zirkelbach removed Appellant's sport coat, searched it, and found a small packet in the breast pocket. The contents of the packet were later tested and proved to be cocaine. The testimony was that there were two video cameras in the booking lobby which filmed the procedures there when prisoners were being booked. Appellant moved for production of the video camera tapes forty (40) days after the booking and by that time the tapes had been erased and reused. Appellant claims this represented destruction of evidence that merits reversal of his conviction.

There is conflict in the evidence regarding the actual discovery of the incriminating evidence and the fact that it might have been recorded on the video cameras. Although most of the witnesses, including the police, assumed that the cameras probably recorded the search and discovery, there is no direct evidence that this was so. Furthermore, although Appellant claims he demanded the tapes be preserved, there is conflict from the police on this point and he, in fact, did not request production until forty days after the incident.

Zirkelbach testified that in searching Appellant to record any property he had on his person prior to his incarceration, he took Appellant's jacket. Appellant was then taken to another room for fingerprinting and other processing procedures. During this time, Zirkelbach found the packet of cocaine in the pocket of the jacket. Zirkelbach testified that Officer Peggy Sims was present and observed the discovery of the cocaine. Sims was in California on vacation during Appellant's trial and did not testify. There is no showing or claim that she was purposely absent during the trial, nor any mention of any statements from her as to the event or as to what she might have testified to had she been called during trial or in deposition. Zirkelbach testified he was generally aware that there were two video cameras located in the booking lobby and that it was his understanding these cameras recorded video procedures. The cameras were controlled from a control room outside the presence or control of the booking officers and Zirkelbach had no actual knowledge of their handling. He said he assumed they were for the most part used concerning complaints against police officers in the handling of prisoners and had never paid much attention to them. Since the control for the cameras was outside of the booking room and in the hands of other people, he did not know whether or not the cameras were on but assumed they probably were. He said he had never paid much attention to them, had never used one, and, in fact, had never seen one of the tapes.

Detective Mattingly, Zirkelbach's superior, testified he had a conversation with Appellant shortly after his arrest, either on the same night or on the following day. Mattingly went to Appellant's cell to talk to him about an unrelated case that Mattingly was investigating. Mattingly was not directly involved in Appellant's case and did not visit Appellant for the purpose of discussing the instant case. Mattingly testified Appellant told him that Zirkelbach discovered the packet of cocaine lying on the floor near Appellant. He said Zirkelbach picked it up off the floor and accused Appellant of dropping it. Appellant told Mattingly there were other persons in the booking room that could as well have dropped the packet as Appellant, and complained to Mattingly that he was falsely charged by Zirkelbach. Mattingly testified Appellant did not tell him, Mattingly, that Zirkelbach had planted the cocaine on him nor did Appellant request that the videotape be saved. Mattingly stated he really did not want to discuss this case with Appellant but told him that there were video tapes going in the booking room and if a police officer did something wrong, it would be on the tape. Further, Mattingly told Appellant that if Zirkelbach did some-

thing wrong, he would be in more trouble than Appellant because the video tapes would be reviewed by the Police Department's Internal Affairs Division. Mattingly then stated Appellant seemed to be satisfied with this explanation and they discussed it no further.

Appellant admitted he was out of the room when a search of his jacket was made by Zirkelbach, and stated he had not told Mattingly the packet was found on the floor. He further claimed he demanded of Mattingly that the video tape be saved and Mattingly promised him it would be. Appellant's claim is there was no cocaine in his pocket and the only way it could have gotten there was for Zirkelbach to have "planted" it. Appellant's father also testified he was with Appellant when Appellant was arrested and that he knew his son had no cocaine on him. He also stated that when Appellant was arrested Zirkelbach thoroughly examined all of Appellant's pockets and found no cocaine at that time. Detective Zirkelbach had previously testified he only "patted down" Appellant for weapons at the time of arrest.

Officer Harold Matthews of the Evansville Police Department's Records and Identification Section, testified that the Records Room has in its possession between twenty and twenty-five video tapes, depending on the number being held as evidence at any given time. He said that if they used one to two tapes a day they would go through the entire cycle of their tapes in ten to twenty days. Appellant's motion to preserve the video tapes was filed approximately forty days after the video tape was made, at which time it had already been reused and was not available. Zirkelbach testified Appellant had never inferred he wished to have the tape preserved and Zirkelbach did not do so because he said he never did pay any attention to them. He said he was generally aware that taping was done but had never used the tapes for any purpose.

There was also testimony by one Roy Ware, who testified Detective Zirkelbach had previously told Ware that he, Zirkelbach, wanted to "get" Appellant and asked Ware to plant a certain bag or package in Appellant's automobile. Ware's testimony was unclear as to whether he did, in fact, plant such package in Appellant's automobile. Further, Ware was unable to state what was in the package and he gave no testimony as to the result of the incident. Zirkelbach testified he had only one previous dealing with Appellant Johnson. He testified he had investigated a crime sometime before this one in which he thought Johnson might have been involved. He said he talked to Johnson and other witnesses and determined that Johnson was not involved. That involvement and this one, in which he served the arrest warrant, were the only dealings he had had with Appellant Johnson.

All of this evidence was heard by the jury. The trial court heard motions to dismiss based on this issue and denied them. The trial court stated there was no evidence because it had no way of knowing what the tape would have shown. In other words, he stated, "If they had the tape and showed it, it might not be anything other than a search of his body and then the officer removed something and that would be it. Again it might not even reflect that. Maybe the camera didn't show that." We tend to agree with the trial court that there is no showing here that the tape represented exculpatory evidence or that it obtained any evidence at all. It appears from all of the evidence that the tapes were reused in the normal course of business and that neither the police involved, nor the prosecutor, saw any particular need to preserve the tapes in this case.

■ As we stated in *Wilson v. State* (1982), Ind., 432 N.E.2d 30, 32:

"Prosecutors have discretion to make determinations after a charge has been filed and before a defendant has requested discovery regarding the materiality of evidence and whether or not it should be retained, produced, or destroyed. *Birkla v. State* (1975), 263 Ind. 37, 323 N.E.2d 645. Appellant correctly asserts that the negligent destruction or withholding of material evidence by the police or prosecution may present grounds for reversal.

*Hale v. State* (1967), 248 Ind. 630, 230 N.E.2d 432."

*Wilson,* at 32; *see also Ross v. State* (1980), 274 Ind. 588, 413 N.E.2d 252. While Appellant is correct that he should not be required to conclusively prove that the destroyed evidence was exculpatory, it is also true that there must be some indication that the evidence was exculpatory and we cannot assume that the destroyed evidence contained exculpatory material when the record is devoid of such indication. *Wilson,* at 32.

Appellant's reference to recent holdings of the United States Supreme Court do not support his contention regarding the efficacy of the tapes in the instant case. In *United States v. Agurs* (1976), 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342, the Court discussed the failure of the prosecution to disclose material exculpatory evidence. The Court said in *Agurs:* "But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce it must be produced even if no request is made." *Id.* at 107, 96 S.Ct. 2399, 49 L.Ed.2d at 351. The Court further stated it is the character of the evidence which is dispositive and that: "... some evidence is obviously of such substantial value to the defendant that elementary fairness requires it to be disclosed even without a request." *Id.* at 110, 96 S.Ct. at 2401, 49 L.Ed.2d at 353.

In *California v. Trombetta* (1984), 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413, the Court again held that the State has a duty to preserve evidence that might be expected to play a significant role in the suspect's defense. The Court held that the evidence must possess an exculpatory value that was apparent before the evidence was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means. *Id.* at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422.

Failure to disclose was again the issue in *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481, in which the Supreme Court held that evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability was defined as a probability sufficient to undermine confidence in the outcome. *Id.* at 682, 105 S.Ct. at 3384, 87 L.Ed.2d at 499.

This case does not involve a failure to disclose. It is apparent the defense was aware of the tapings in the booking room from the very outset. The trial court found there was no showing there was anything in the tapes that would make any difference in the outcome of the case. The testimony showed the tapes were reused in the same manner that all other booking tapes are routinely reused unless there is some particular reason to preserve them. There is no showing here that the tapes were erased intentionally or negligently by the police in order to suppress material evidence. Neither is there a showing that anything they showed would be significant or that there was a high and reasonable probability that they were exculpatory. We accordingly find no error in the trial court's refusal to dismiss the cause on this issue.

## II

■ Appellant here was convicted on Count I, Possession of Cocaine, which is a class D felony. Ind. Code § 35–50–2–7(b) (Burns 1985) provides that if a person has committed a class D felony the court may enter judgment for a class A misdemeanor and sentence accordingly. When Appellant here was sentenced, he asked the trial judge to enter judgment on Count I as a class A misdemeanor and the court refused to do so. The only claim of error presented by Appellant here is that the trial judge refused to consider this alternative because he felt that he lacked the authority to do so. Appellant's contention is not supported by the record. The record shows the trial judge advised counsel he was not going to consider the alternative of a class A misdemeanor sentencing and stated to the parties he was not refusing to consider the option but was rejecting the option. The trial court gave ample reasons for imposing

the sentence and his reasons are supported by the evidence.

The judgment of the trial court is affirmed pursuant to Ind.Rules App. Proc. 15(F).

GIVAN and PIVARNIK, JJ., vote to affirm the conviction.

DeBRULER and DICKSON, JJ., vote to reverse the conviction.

SHEPARD, C.J., not participating.

DeBRULER, Justice, separate opinion.

The destruction of a videotape, which could have contained a recording of the purported commission of and discovery of the crime of which appellant stands convicted, violated his due process rights and requires reversal of his conviction.

On March 2, 1984 Detective John Zirkelbach arrested appellant on an outstanding theft warrant and transported him to the booking lobby of the Evansville Police Department. There are two video cameras in the booking lobby which record the booking process. While appellant was being booked, Detective Zirkelbach purportedly discovered a small amount of cocaine in appellant's coat. Detective Mattingly, Zirkelbach's direct superior, testified that he had a conversation with appellant either the night of his arrest or the next day. During that conversation, appellant indicated to Mattingly that he believed the tape made while he was being booked would prove him innocent of possessing cocaine. Detective Mattingly informed appellant that the tape would be reviewed by internal affairs and if Detective Zirkelbach was wrong, he would be in more trouble than appellant. Mattingly testified he was not sure appellant asked him to preserve the tape. Mattingly did not review the tape or ask that it be preserved as he "didn't believe Larry Johnson". The tape of appellant's booking was not preserved nor to anyone's knowledge was it ever reviewed. Testimony at the suppression hearing revealed that tapes were routinely reused every 10 to 25 days (in this case that period would cover March 12 to March 27) unless a specific request for preservation was made. Appellant was not charged with possession of cocaine until March 15, 1984. Appellant's contention is that he was denied a fair trial due to the State's destruction of a videotape of the alleged offense occurring and being discovered.

The separate opinion of Justices Given and Pivarnik rejects appellant's argument based on his inability to prove the videotape recorded the purported discovery or that the tape would prove exculpatory.

The true issue before us is whether the intentional non-preservation of discoverable evidence amounts to its illegal suppression. In *Birkla v. State* (1975), 263 Ind. 37, 323 N.E.2d 645, a tape of a conversation between the co-defendant and his wife, in which she made an incriminating statement contrary to her trial testimony, was destroyed by the prosecution. In *Birkla,* the tape was reviewed by the prosecutor, who, in a later affidavit, averred he did not believe the tape would be valuable to the defendant. In discussing the destruction of the recording, this court stated:

"In support of the present rule permitting prosecutorial discretion in the destruction of nonmaterial evidence, the state argues that a mandatory retention rule 'would require the police and prosecutors to become repositories of superfluous material, obligated to preserve the fruits of absolutely every inquiry made, however meritless or fallacious they were revealed to be upon further investigation.' We cannot say the interest advanced by the state is not a legitimate one. However, it is not of the same magnitude as a defendant's right to a fair trial. We therefore hold that when the prosecution determines evidence to be nonmaterial, and further decides not to advise defense counsel of such evidence prior to its destruction, *a heavy burden rests upon the prosecution to demonstrate that the destruction of such evidence did not prejudice the defendant.*" [emphasis added]

*Birkla* went on to establish guidelines for use by the State in weighing the materiality of evidence:

"In determining materiality, the prosecution should consider the seriousness of the charge. The prosecution must consider whether the evidence is relevant either to the defendant's guilt or punishment. The prosecution must evaluate the potential usefulness to the defendant of the evidence, for rebuttal or impeachment of the state's case. After considering all of these factors, if the prosecutor has any doubts concerning the potential materiality of the evidence, he must retain it."

In the case before us, prior to a charge of possession of cocaine being filed and therefore prior to the defense having any duty to request preservation of evidence, the State had actual knowledge and notice that appellant believed the tape contained evidence of his innocence on Zirkelbach's allegation that he had cocaine in his possession. Mattingly, who testified appellant conveyed to him the tape would prove his innocence, arbitrarily decided appellant was not being truthful and therefore took no steps to effect preservation of the tape.

Mattingly did not use the guidelines specified in *Birkla*. He did not consider the seriousness of the charge, whether the evidence was relevant to appellant's guilt or punishment or evaluate the potential usefulness of the evidence to appellant. He further made an affirmative representation to appellant that the tape would be reviewed by internal affairs and then did not pass along appellant's accusation, ask that the tape be preserved, or review it himself. He did not testify appellant didn't request preservation, rather he stated he did not remember if appellant did. When asked why he took no steps to preserve the tape, Mattingly testified that he thought he had satisfied appellant by informing him internal affairs would review the tape. This assurance, rather than alerting appellant that the tape would be destroyed, caused appellant to assume the tape, which he believed would exonerate him, would be examined to see if it supported his allegation. Instead, Mattingly, as Zirkelbach's direct superior, failed to take any action whatsoever upon appellant's allegation. Intentional inaction cannot be used to justify the destruction of the evidence. *Birkla* places the burden of demonstrating that the destruction did not prejudice the defendant on the State. The defendant cannot be penalized for *his* failure to prove what was on the tape. This approach, rather than encouraging police to be diligent in preserving important evidence, would encourage them to destroy or "not preserve" material, possibly exculpatory evidence.

Other jurisdictions have dealt with this issue and have consistently refused to place the burden upon the defendant of proving the contents of the destroyed material. In *United States v. Bryant* (1971), 439 F.2d 642 (D.C.Circuit), government agents made a tape recording of motel room conversations between the defendants and an undercover agent allegedly concerning the sale of narcotics and the tape recording was later lost. The agent in charge of the taping testified at a hearing that he made no effort to preserve the tape because he had not intended to use it as evidence at trial. In an excellent opinion, Judge Skelly Wright pointed out that:

"It is important to recognize that this is not a case of a good faith effort to preserve highly relevant evidence, frustrated only by inadvertent loss. Rather, it is a case of intentional non-preservation by an investigative official. On a spectrum between good faith but inadvertent loss and bad faith destruction, Agent Warden's conduct must lie somewhere in the middle. Perhaps it should lie somewhat closer to the latter end. * * * * [I]n these cases we are entirely in the dark. We have no idea what may have been on the tape. For all we know, the tape would have corroborated Agent Pope's story perfectly; or, for all we know, it might have completely undercut the Government's case. There is not simply 'substantial room for doubt,' but room for nothing except doubt as to the effect of disclosure. What we do know is that the conversations recorded on the tape were absolutely crucial to the question of appellants' guilt or innocence. That fact, coupled with the unavoidable possibility that the tape might have been signifi-

cantly favorable to the accused, is enough to bring these cases within the constitutional concern. If the due process requirement is directed to evidence whose non-disclosure 'might' have harmed the accused, its purpose clearly reaches the type of missing evidence at issue here. Were *Brady* and its progeny applicable only where the exact content of the non-disclosed materials was known, the disclosure duty would be an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal. The purpose of the duty is not simply to correct an imbalance of advantage, whereby the prosecution may surprise the defense at trial with new evidence; rather, it is also to make of the trial a search for truth informed by all relevant material, much of which, because of imbalance in investigative resources, will be exculsively in the hands of the Government."

In *People v. Harmes* (1976), 38 Colo.App. 378, 560 P.2d 470, the defendant was charged with assault following an altercation with police at the station. The officers had activated a video camera as they entered the station with defendant. The defense was informed at the preliminary hearing that the videotape would be held by the police as evidence against defendant purportedly probative of the alleged assault, but the videotape was not preserved. In ordering the judgment reversed, the Colorado Court of Appeals observed:

"The duty to preserve evidence known to be material is part of the duty to disclose. The principle underlying this rule is the constitutional requirement that a criminal defendant be afforded due process. The focus therefore is not upon the existence or extent of any culpability by the authorities in failing to preserve clearly material evidence, a matter not generally susceptible of proof by defendant. Rather, it is directed at the effect that the loss of the particular item of evidence has on defendant's ability to defend against the criminal charges. Thus, although it may be questionable terminology to label cases involving negligent loss or destruction of critical evidence as instances of 'suppression', the effect of non-availability to the defendant is at least as damaging under these circumstances as it is in cases involving intentional non-disclosure.

The destruction of the videotape through official misfeasance has effectively precluded defendant from ever demonstrating whether it supported his version of the altercation. He was thus denied due proccess. The evidence destroyed was known to be material and critical, and not merely incidental to, the question of defendant's guilt or innocence, and therefore, the duty to preserve the film for its evidentiary value was apparent. The significance of the eradicated evidence in this case reflects disfavorably on the failure to ensure its preservation. This is not a case, therefore, in which inadequate investigation resulted in the careless destruction of evidence not known to be material at the time. Nor is this a case where defendant should be penalized for his counsel's procrastination in seeking to view the videotape, since, as is stated in the uncontradicted motion to dismiss, defense counsel was informed that the videotape was being held by the police as evidence damaging to the defense.

Hence, by establishing the existence and negligent destruction of this particular evidentiary item, defendant established a sufficient factual foundation in support of his contention of denial of due process. * * * * The videotape was not made the subject of disinterested analysis by any person, it could easily have been preserved for perusal by the exercise of minimal care by the authorities, and defendant was led to believe by the statements of the prosecution that the videotape would be preserved by the People for use against defendant at trial. * * The materiality of the destroyed videotape cannot be questioned. Had it been preserved, it likely would have conclusively established defendant's innocence or guilt * * * * [T]he People urge that defendant's inability to demonstrate that

the videotape was favorable to the defense thus defeats his claim of denial of due process. They also contend that the testimony of the arresting officers that the film supported their account of the incident, coupled with the proffered testimony of another officer who purportedly viewed the film, was sufficient to establish its inculpatory character. We do not agree.

Where, as here, crucial material evidence is wholly destroyed by the prosecution, and the responsibility for such destruction cannot properly be imputed to the defense, any requirement that defendant somehow demonstrate that the evidence was exculpatory becomes an absurdity, and is not imposed." [citation omitted]

As in *Harmes*, the facts before us show that the police were aware of the possible exculpatory nature of the videotape yet neglected to ensure its preservation. Defense counsel cannot be faulted for waiting 40 days from the date of arrest to seek preservation when the State was on notice appellant considered the tape material, appellant may have specifically requested preservation and was assured the tape would be reviewed, and the State presented evidence indicating the tape may well have been destroyed prior to a possession charge being filed against appellant.

The Colorado Supreme Court has adopted the *Harmes* approach. In *Garcia v. District Court* (1979), 197 Colo. 38, 589 P.2d 924, in ruling the State must preserve a sample of defendant's breath for his separate testing as to blood alcohol content, the court held it was not necessary for the defendant to demonstrate the evidence would have been favorable to him, so long as the evidence was not merely incidental to the prosecution's case or the defendant's affirmative defense. They further held that failure to preserve evidence, when the act is a mere incident to routine procedure, is the equivalent of suppression of evidence. "It is incumbent upon the state to employ regular procedures to preserve evidence which a state agent, in the regular performance of his duties, could reasonably foresee " 'might' be 'favorable' to the accused." " *Garcia, supra.*

Here, the record reveals that it was routine procedure to record all booking procedures but that no regulations were enforced to ensure the preservation of tape recordings of the commission of crimes in the booking lobby.

In *People v. Sheppard* (1985), Colo., 701 P.2d 49, the Colorado Supreme Court again applied this approach when affirming the trial court's dismissal of a vehicular homicide charge against defendant due to the destruction of the vehicle he had been driving. The defendant had not requested preservation or examination of the car until more than four months after the accident. The car was destroyed subsequent to the filing of defendant's motion but before it was granted. The trial court found the motion to be timely since it was filed within the allotted period specified by the court for filing pre-trial motions.

Appellant's motion for preservation was filed well within the time permitted by the court.

The Iowa Supreme Court affirmed the suppression of blood test results showing defendant's blood-alcohol level was .184% following an accident which resulted in a voluntary manslaughter charge being filed against appellant, due to the State's failure to preserve a sample of defendant's blood. *State v. Brown* (1983), 337 N.W.2d 507. The court related that it had "no reason to doubt that the sample would not have been destroyed had the officer so requested. In these circumstances, the State had an obligation to preserve the evidence and could have done so by following established procedures, but did not." *Brown, supra.* In our case, the State presented evidence that tapes are not reused when a request for preservation is made by a police officer, the prosecution or the defense.

Additionally, in *City of Seattle v. Fettig* (1974), 10 Wash.App. 773, 519 P.2d 1002, the Washington Court of Appeals ordered dismissal of driving while intoxicated charges due to the negligent destruction by police of a videotape of defendant performing field sobriety tests.

Perhaps the best summary of the rationale developed by these cases was provided in *Bryant, supra:*

"It is most consistent with the purposes of those safeguards to hold that the duty of disclosure attaches in some form once the Government has first gathered and taken possession of the evidence in question. Otherwise, disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence. Hence we hold that before a request for discovery has been made, the duty of disclosure is operative as a duty of preservation. Only if evidence is carefully preserved during the early stages of investigation will disclosure be possible later. * * * * Of course, the regular procedures for preservation must be adequate to the task; systemic non-preservation of tapes involving Government undercover agents—as in the cases before us—might be regular, but would be insufficiently protective of defendants' right to discovery. Accordingly, we hold that sanctions for non-disclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable evidence gathered in the course of a criminal investigation. The burden, of course, is on the Government to make this showing. Negligent failure to comply with the required procedures will provide no excuse. * * * * By requiring that the discretionary authority of investigative agents be controlled by regular procedures for preserving evidence, we intend to ensure that rights recognized at one stage of the criminal process will not be undercut at other, less visible stages.

In the case before us, no safeguards were employed, nor did any thoughtful decision making result in the destruction of the tape. Rather, the police simply chose to ignore the existence of the videotape in the face of appellant's assertions that it would prove his innocence. A rule requiring appellant to prove the contents of the tape, as stated by the Colorado Court of Appeals, would be an "absurdity". In 1975 this court placed the burden of proof on the State to show the destruction did not prejudice the defense and established guidelines for the State to follow in determining whether or not preservation was required. *Birkla, supra.* The separate opinion of Justices Pivarnik and Givan misplaces the burden of proof, ignores the guidelines we established and is contrary to the result reached in numerous other jurisdictions. In making a determination of guilt or innocence, the jury was faced with an issue of credibility. The videotape might have supported appellant and it might have supported Detective Zirkelbach. The State has the burden of establishing that the destruction did not harm appellant and since the tape was never reviewed, its contents are mere speculation. The State cannot meet its burden and the charges against appellant should be dismissed.

The judgment of the trial court is affirmed pursuant to Ind.Rules App.Proc. 15(F).