**Jeff HOUSE, Appellant**
**(Defendant below),**

v.

**STATE of Indiana, Appellee**
**(Plaintiff below).**

**No. 86S00–8605–CR–456.**

Supreme Court of Indiana.

March 2, 1989.

Kenneth J. Fishman, Daniel Patrick Leonard, Bailey & Fishman, Boston, Mass., Forrest Bowman, Jr., Bowman, Tucker & Emery, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant–Appellant Jeff House was convicted in a jury trial of Murder, and received a sixty (60) year sentence. His Motion to Correct Errors was denied, and he directly appeals to this Court.

House raises the following issues on appeal:

1. whether he was denied due process of law when the State failed to disclose possibly exculpatory evidence;

2. trial court error in permitting the State's main witness to invoke the marital communications privilege;

3. trial court error in admitting hearsay statements of two witnesses;

4. trial court error in admitting evidence of possible drug use by House as part of the *res gestae* of the crime; and

5. trial court error in admitting certain instructions tendered by the State.

The facts most favorable to the verdict show that Donald Hulsey, the victim, was last seen alive at approximately 1:15 a.m. on June 3, 1979. Later that day at approximately 2:00 p.m., his brutally beaten corpse was found in a field in Warren County, Indiana. The cause of death was multiple and massive skull fractures from blows with a blunt instrument. A homemade club fashioned out of a hollow metal table leg filled with gravel and secured with tape was found nearby. The club was bent; blood and hair found on the club matched Donald Hulsey's. The murder was unresolved for nearly six (6) years.

In those years, however, House made some apparently serious "confessions" to the murder, and would then state he was only joking. In April 1985, Jon Wood confessed to participating in the murder, and implicated House, Scott Talbott, and Jeff Wilson. At trial, Wood testified he attended a party at the Wilson residence in Warren County on the evening of June 2, 1979. He stated he left the party at around 12:30 a.m. with House, Talbott, and Wilson to buy more beer. House was driving his car and the others were passengers. The group smoked marijuana and drank beer. Some time during their trip they began discussing finding a "queer" to beat up. They drove around a park and spotted Donald Hulsey by a phone booth. The car stopped and the passengers had a conversation with Hulsey. For some reason, he did not get into the car at that point, but voluntarily got into the car after walking to a different spot in the park.

At this time, House was alone in the back seat. When Hulsey got in, House began speaking in an effeminate tone of voice to him. Wood testified that although he didn't actually see what happened next, he heard House punch Hulsey several times, saw House's fists raised, and heard

a groan. The driver of the car then stopped near a mausoleum to decide what to do with Hulsey. There is no clear evidence as to whether Hulsey was dead at this point, but at trial Wood stated he doubted whether Hulsey was alive because he was not moving. He also stated at trial he, Wood, was dropped off at Layton's Star Market before the body was disposed of. Wood later learned from Talbott further details of the beating.

Wood was questioned several times about the murder between 1979 and 1985 while incarcerated on drug trafficking charges. Eventually he admitted he was involved in the murder. Also, evidence was admitted at trial which showed Wood's hand was crushed in a paste machine while he was substituting for House at C & D Battery in April, 1979. Wood admitted he had told friends "this is Jeff House's hand." Other evidence showed he stated at certain times he wanted to get House back for the injury.

Bonnie Sherman was the State's other main witness. She dated House during the summer of 1979. She testified she and House attended the Wilson party together, but he brought her home at 11:30 that evening. Sherman stated she went to House's residence the next morning and found him searching through the newspaper for information about a murder. Later that afternoon he and Sherman went out driving around some back roads searching for something. Apparently when he spotted what he was looking for, he instructed her to drive quickly and not look. Sherman said House had "confessed" to killing Donald Hulsey on several occasions, and made it seem like a joke. One time however, he convinced her he was telling the truth.

At the same time Jeff House was being investigated for the murder, the police were also investigating another possible suspect, Harold Hensley. Hensley's brother, Raymond, implicated him in the crime, but throughout the six year investigation gave conflicting versions of events.

## I

House first raises on appeal the claim the State denied him a fair trial be-cause the prosecutor failed to disclose possibly exculpatory evidence to him prior to trial. Before trial, defense counsel made a general request for exculpatory evidence which the trial court granted. House claims statements made by Harold and Raymond Hensley should have been furnished.

It is well founded that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. It is also well founded that where defense counsel either makes no request or requests "all *Brady* material" or "anything exculpatory," any duty on the prosecutor's part must stem from the obviously exculpatory character of the evidence. *United States v. Agurs* (1976), 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed. 2d 342. The question is to what level of materiality the evidence must rise to render it obviously exculpatory. The mere possibility an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. *Id.* at 109–10, 96 S.Ct. at 2400–01, 49 L.Ed.2d at 353. However, if the omitted evidence creates a reasonable doubt that did not otherwise exist, and it is withheld from the defendant, constitutional error has been committed. This means the omission of the evidence must be evaluated in the context of the entire record. *Id.* at 112, 96 S.Ct. at 2401–02, 49 L.Ed.2d at 355. If there is no reasonable doubt about guilt whether or not additional evidence is considered, there is no justification for a new trial. However, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. *Id.* at 112–13, 96 S.Ct. at 2401–02, 49 L.Ed.2d at 355.

This court adopted the rules set forth in *Agurs* in *Richard v. State* (1978), 269 Ind. 607, 382 N.E.2d 899, *cert. denied* 440 U.S. 965, 99 S.Ct. 1515, 59 L.Ed.2d 781 (1979).

However, House asserts that the standard of materiality as enunciated in *Agurs* has been modified in *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481, and therefore the trial court erred when it established materiality according to *Agurs* and *Richard.* The issue addressed in *Bagley* concerned the standard of materiality to be applied in determining whether a conviction should be reversed because the prosecutor failed to disclose requested evidence which could have been used to impeach a government witness. The United States Supreme Court determined that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. The *Bagley* Court held that the prosecution's failure to disclose requested impeachment evidence amounts to constitutional error only if there is reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceeding would have been different. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3384, 87 L.Ed.2d at 494. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. This standard of materiality is sufficiently flexible to cover cases of prosecutorial failure to disclose evidence favorable to the defendant regardless of whether the defense makes no request, a general request, or a specific request. *Id.* The possibility the defendant's case may have been impaired does not necessitate a different standard of materiality, however. The *Bagley* Court found that under the formulation in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh. denied* (1984), 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864, the reviewing court may consider directly any adverse effect the prosecutor's failure to respond might have had on the defendant's preparation or presentation of his case. "The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." *Bagley,* 473 U.S. at 683, 105 S.Ct. at 3384, 87 L.Ed.2d at 494.

This decision is in line with the relevant case law in Indiana which requires the defendant to establish the materiality of the evidence as well as any prejudice regarding unavailability of the evidence. See *Birkla v. State* (1975), 263 Ind. 37, 323 N.E.2d 645, *cert. denied* 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77, and *Murray v. State* (1982), Ind., 442 N.E.2d 1012. House, however, asserts that *Bagley* sets a new or looser standard of materiality, that being the reasonable probability standard. This according to House, contrasts with the "reasonable doubt which did not otherwise exist" standard of *Agurs* and *Richard.*

House's attorney was aware, prior to trial, that Harold Hensley was being investigated for the murder, and that he had been questioned by police officers. Still, he made only a general discovery request. Also, the evidence supports the conclusion there was no reasonable probability the interviews regarding Hensley's alleged involvement would have made a difference in the outcome of the trial. House confessed to his girlfriend and convinced her he committed the crime, Jon Wood was an eyewitness to the first part of the crime, and the murder weapon was connected to House. While some of the detail the Hensley brothers and their witnesses told officers was correct, that evidence can be characterized as inconsistent and contradictory. Raymond Hensley detailed the murder, and stated Hulsey was at the Wilson party the evening he was killed; Hulsey was not at the party, he was with members of his family. In a 1981 interview, Raymond and another witness stated the murder took place at 7:30 p.m. This again was impossible because Hulsey was with family members until after 1:00 a.m. Also, Raymond apparently had the reputation of being a liar, and in fact had tried almost daily to bargain his way out of charges pending against him by offering information on other crimes.

Raymond was again interviewed in 1983 regarding the Hulsey murder. This version of events differed from that in the

1981 interview. A polygraph examination showed Hensley was lying at this time. During a series of subsequent interviews police attempted to determine whether there was any truth to Hensley's accusations. Although some details matched the evidence the police had accumulated, most information was contradictory and confusing. When considered in light of Hensley's lack of credibility, this evidence does not rise to the level of reasonable probability. Therefore, House was not denied a fair trial by the State's failure to turn over this evidence.

## II

■ House next claims the trial court erred in upholding Jon Wood's invocation of the marital communications privilege. This privilege, which protects communications between a husband and wife, is based on strong public policy grounds which favor promotion and preservation of marital confidences, even at the expense, in certain instances, of preventing otherwise relevant testimony. *Bergner v. State* (1979), Ind. App., 397 N.E.2d 1012, 1019. The claim of marital privilege is restricted to confidential communications and information gained by reason of the marital relationship. *Mahoney v. State* (1979), 180 Ind.App. 358, 363, 388 N.E.2d 591, 594; *Gajdos v. State* (1984), Ind., 462 N.E.2d 1017, 1021. However, the privilege is waived if the communication was made in the presence of a third party or if it is meant to be relayed to or is intended for a third party. *Perkins v. State* (1985), Ind., 483 N.E.2d 1379, 1383; *Robinson v. State* (1981), Ind., 424 N.E.2d 119, 121.

■ House argues that when Jon Wood admitted to having a conversation with his wife regarding his involvement in the murder, and because he detailed his knowledge of the crime on direct examination, Wood waived the privilege. House cites *Driver v. Driver* (1898), 153 N.E. 401, in support of his argument. There, a witness had detailed various conversations with his wife, whom he was attempting to divorce. The trial court admitted certain contradictory letters he had written his wife based on the fact the witness had given such great detail of their conversations. Such is not the case here, however. Wood told of his part in the murder, but did not go into detail regarding the conversation with his wife; he merely stated in the affirmative that he *had* the conversation. Therefore, he did not waive the privilege, and the trial court did not err in allowing Wood to invoke it.

## III

■ House next contends he was denied a fair trial when the court admitted certain hearsay testimony over defense counsel's objection. House claims the prosecutor is guilty of misconduct for injecting an "evidentiary harpoon" into evidence. At the beginning of the trial, the State called Elton Hulsey, Donald Hulsey's brother, to the stand. During direct examination, the following occurred:

Q. Mr. Hulsey, did you receive a phone call from a female telling you who had committed the murder of your brother?

A. Yes.

Q. When did you receive that phone call?

A. I work part-time at the Shell Station in Attica for Kenny Garrett ...

Defense counsel then cut off the questioning, and at a side bar conference, may have stated his reasons for objecting. Unfortunately, the court reporter could not hear this conversation, and therefore did not record it for the record on appeal. The prosecutor then continued with his line of questioning:

Q. Elton, you say you received a phone call indicating to you who had committed the murder, is that true?

A. Yes.

Q. Was the voice on the other end ever identified to you?

A. No.

Q. Was it a male or female voice?

A. Female.

Q. You were never able to determine who made the call?

A. No.

Q. Did you report that to the police?

A. Yes I did.

The record reveals no objection or other challenge to the line of questioning. *Bowens v. State* (1985), Ind., 481 N.E.2d 1289, 1290. Had an objection been made during the bench conference, House should have corrected any deficiency in the record according to Appellate Rule 7.2(C). On appeal, the appellant carries the burden of presenting a record sustaining his argument. *Gatewood v. State* (1982), Ind., 430 N.E.2d 781, 785. House has failed to do so. Even if the request to approach the bench were to be viewed as an objection, that objection would not be timely made. The question concerning the fact the phone call was made had been asked and answered, and a second question had been asked and answered prior to defense counsel's request. Any error, therefore, was waived. Also, the trial court permitted the witness to testify that someone had been identified but cut off any testimony regarding who that person was. Even if the issue had not been waived, it was harmless.

The second instance where House claims hearsay evidence was improperly admitted was during Allen Dobbs' direct examination. Dobbs worked at the same place House did, and testified as follows:

Q: Now following that time, did you ever have an occasion or occasions at work to hear any reference to Jeff House to that crime?

MR. TRUEBLOOD: Your Honor, to which I'm going to object. The question is so broad, it might very well call for a hearsay that would be inadmissible at this point.

Q. ... in the presence of Mr. House?

MR. TRUEBLOOD: Your Honor, that doesn't eliminate a hearsay objection.

MR. DOWD: He's present for cross-examination Judge. He can answer if he heard any conversations. Number one. That's the only thing being ask [sic] at this point.

MR. TRUEBLOOD: You need a foundation as to the time and place and who was present.

COURT: Overruled.

Q. You may answer sir.

A. Do you want me to elaborate on it? I mean ...

Q. Were you ever present when any reference was ever made in Mr. House's presence?

A. I heard an argument, yeah.

Q. Tell this court and jury about when that would have been, to the best of your knowledge.

A. About when it was? It was a number of years ago. I was working well, I wasn't right at where it was going on. I heard some yelling going on. I heard "Hulsey murder." I looked up and I seen Jeff and that was it.

Q. What, if anything, did he do or say?

A. He didn't say anything.

Q. Was he being called the Hulsey murderer, is that what you're telling me?

A: I assume that ...

ALLEN DOBBS—CROSS EXAMINATION BY DEFENSE COUNSEL

Q. Mr. Dobbs, do you know who was doing the accusing?

A. No. I was three-fourths the way across the plant when this was going on. I heard some yelling going on; I heard that and I looked up and that's what I most remember, just seeing Jeff and that was that....

Q. Did he say anything or admit it or deny it?

A. No.

Q. Might be the kind of thing that might upset you if somebody would do that, wouldn't it?

A. Definintely [sic].

Q. You don't know who it was that made the comment?

A. No. There's a lot of people working in there, you know, and most of all, I just remember looking at him, you know, I mean. Somebody says that and I just looked at him.

A. What does this all mean?

A. It means nothing to me.

Silence or an equivocal response to an assertion made by another, which would ordinarily be expected to be denied, is a tacit admission. The assertion and the words or conduct are admissible if the reac-

tion is not a clear denial. *Moredock v. State* (1982), Ind., 441 N.E.2d 1372, 1374; *Wickliffe v. State* (1981), Ind., 424 N.E.2d 1007, 1009; *Jethroe v. State* (1974), 262 Ind. 505, 511–14, 319 N.E.2d 133, 138–39. The purpose of Dobbs' testimony was to show tacit admission by House's silent reaction to the comment that he was the Hulsey murderer. A conversation where the defendant is present and the foundation has been laid establishing the time, place, and who besides the defendant was present, may be admitted, where there has been a tacit admission, as an exception to the hearsay rule. *Jethroe*, 262 Ind. at 511–14, 319 N.E.2d at 138–39. Although rather weak, those requirements appear to have been met here. The primary weakness of the testimony is the reliability of the witness's testimony considering the circumstances he described. However, this is a question of credibility for the jury and not one of admissibility. No reversible error is presented.

### IV

■ House also asserts on appeal trial court error in admitting hearsay testimony regarding possible drug use as a part of the *res gestae* of the crime. At trial, on direct examination, Bonnie Sherman testified that when she and House first arrived at the Wilson party, someone offered them some acid. Defense counsel then asked to approach the bench. After that, the prosecutor continued with a different question. There is nothing in the record to show defense counsel made an objection to the testimony. Again, because of this, it is impossible for us to review any possible error. The issue is therefore waived. However, even if the issue had not been waived, there is no indication that because of this testimony, House was prejudiced. There is no testimony that he in fact used acid. Also, the jury had already heard, through Jon Wood's testimony, that House had been drinking and smoking marijuana. This brief mention of drug availability did not cause reversible error.

### V

■ House next asserts trial court error in giving State's tendered instruction No. 4. That instruction read:

A conviction may be sustained primarily upon the testimony of an admitted accomplice. The testimony of accomplices does not lack probative value as a matter of law, and their credibility and the weight to be given their testimony are questions properly left to the jury.

House claims the instruction invades the province of the jury by commenting favorably on the credibility and weight to be given accomplice testimony. However, this exact instruction was held to be proper in *Hartwell v. State* (1974), 162 Ind.App. 445, 451, 321 N.E.2d 228, 232. *See also Turner v. State* (1972) 258 Ind. 267, 280 N.E.2d 621; *Gertchen v. State* (1973), 158 Ind.App. 691, 304 N.E.2d 335. The trial court did not err in giving this instruction.

■ House also challenges the tendering to the jury of final instruction No. 8, which read:

If a defendant is innocent, he should not be convicted erroneously; but, if a defendant is guilty, he should not be acquitted erroneously. By acquittal of the guilty a contempt of the law is aroused among the criminal classes and the safeguards of society are weakened.

House particularly urges trial court error because no other final instruction emphasized the principle that all criminal defendants are presumed innocent until proven guilty. However, preliminary instruction No. 8 did clearly cover that ground. In addition, final instruction No. 8 has also been approved in this exact language in *Sankey v. State* (1973), 157 Ind.App. 627, 635, 301 N.E.2d 235, 239. *See also Tessely v. State* (1978), 267 Ind. 445, 452, 370 N.E.2d 907, 911. The trial court did not err in giving these instructions.

The trial court is affirmed.

SHEPARD, C.J., and GIVAN, J., concur.

DeBRULER, J., concurs and dissents with separate opinion in which DICKSON, J., concurs.

SHEPARD, Chief Justice, concurring.

Though I join the Court's opinion, I agree with Justice DeBruler that this case

does not decide what standard Indiana should use for cases in which the prosecution has disposed of arguably material evidence which might exculpate a defendant.

As a matter of federal due process, this question is resolved by *Arizona v. Youngblood*, 488 U.S. ——, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Whether the Indiana Constitution requires a different test is a question for another day.

DeBRULER, Justice, concurring and dissenting.

I find that I differ with the majority opinion as it resolves the discovery issue. This case involves a situation in which the undisclosed material evidence is available for examination when the claim that the prosecution has wrongfully failed to disclose it to the defense is being litigated. This situation is thus not one in which the material evidence was lost or destroyed while in the hands of the prosecution. The question of who should bear the burdens at the litigation of a claim that the prosecution has failed to disclose material evidence which the prosecution has lost or destroyed, has not been determined for Indiana by this Court. The question was considered in *Johnson v. State* (1987), Ind., 507 N.E.2d 980, but left unresolved because the Court was evenly split. The case *Birkla v. State* (1975), 263 Ind. 37, 323 N.E.2d 645, cited in the majority opinion, is indeed a case involving the destruction of material. There we said:

> We therefore hold that when the prosecution determines evidence to be nonmaterial, and further decides not to advise defense counsel of such evidence prior to its destruction, a heavy burden rests upon the prosecution to demonstrate that the destruction of such evidence did not prejudice the defendant.

*Id.* 323 N.E.2d at 649.

This formulation thus takes care of one facet of the question but not all, and indicates the propriety of relieving the defendant of burdens in this area of the law where destruction of evidence is involved. While I agree with the result reached by the majority opinion on this issue, I point out that when the accused shows that material evidence was in the hands of the prosecution and lost, the question of whether the accused must then go ahead and show prejudice is open in Indiana. In my judgment, when the item is not available for scrutiny by the trial court, but is known to have been material, the risk of loss should be borne by the prosecution, not the defendant. The police and prosecutors are after all highly trained specialists in the gathering and retention of evidence and should be expected to carefully retain all material evidence in usable form.

I also have a different view on the application of the marital communications privilege in this case. Woods confessed to his participation in the crime. He testified for the prosecution and against appellant at trial. His testimony was key, and therefore his credibility was crucial. The trial court permitted the marital privilege to be invoked to prevent the disclosure of Woods' confession to his wife describing his participation in the same crime. In my view, the interest in preserving and promoting marital stability is at a low ebb here, while the defendant's interest in showing possible discrepancies between the two descriptions given by Woods of his and defendant's criminal acts is at maximum flow. In this circumstance, the defendant's basic right to confront and cross-examine is implicated, and in my opinion requires that the marital privilege give way. *Davis v. Alaska* (1974), 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed. 2d 347.

DICKSON, J., concurs.