**Michael G. TYSON, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A04–9211–PC–422.**

Court of Appeals of Indiana, Second District.

Dec. 20, 1993.

See also 619 N.E.2d 276.

Lee B. McTurnan, Judy L. Woods, McTurnan & Turner, Indianapolis, Alan M. Dershowitz, Cambridge, MA, James H. Voyles, Symmes Voyles Zahn Paul & Hogan, Indianapolis, Nathan Z. Dershowitz, Jamin S. Dershowitz, Dershowitz & Eiger, P.C., New York City, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Office of Atty. Gen., on brief, Pamela Lynn Carter, Atty. Gen., Matthew Ryan Gutwein, Lawrence Mark Reuben, Arend J. Abel, Deputy

Attys. Gen., Indianapolis, argued, for appellee-plaintiff.

SHIELDS, Judge.

Michael G. Tyson appeals the post-conviction court's summary disposition of his petition for post-conviction relief. We affirm in part and reverse in part.

### ISSUES

1. Did the post-conviction court err when it summarily denied Tyson's petition for post-conviction relief based on his claim of newly discovered evidence?

2. Did the post-conviction court err when it summarily denied Tyson's petition for post-conviction relief based on alleged violations of *Brady v. Maryland?*

### DISCUSSION

#### I.

Tyson asserts that newly discovered evidence warrants a new trial.[1] To prevail upon a claim for post-conviction relief based on allegations of newly discovered evidence, Tyson must prove:

(1) the evidence was discovered since trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced on retrial; and (9) it will probably produce a different result.

*Lyles v. State* (1991), Ind.App., 576 N.E.2d 1344, 1348, *trans. denied; Francis v. State* (1989), Ind., 544 N.E.2d 1385, 1386.

The evidence which Tyson asserts is newly discovered is that: (1) D.W. planned to sue Tyson in civil court for damages; (2) she planned to market the book and movie rights regarding her experience with Tyson; and (3) "[D.W.'s] father (and perhaps [D.W.] herself) mistakenly believed both that the jury in the criminal case could itself award [D.W.] financial compensation, and that a criminal judgment would be conclusive on the question of liability in the civil case." Petitioner's Brief at 10.

Tyson makes a two-pronged argument with reference to this evidence, the first of which is that this newly discovered evidence entitles him to a new trial because it proves that D.W. and her parents gave false, misleading, or perjurious testimony. The second prong, while related to the first, emphasizes that the new evidence has independent relevance because, without regard to the truthfulness of the trial testimony of D.W. and her parents, the new evidence reveals "powerful financial motives" of D.W. and her parents [2] to seek

1. Tyson also claims that the post-conviction court erred in denying his petition for post-conviction relief without holding an evidentiary hearing. However, Indiana Post-Conviction Rule 1(4)(g) provides "[t]he court may grant ... summary disposition of the petition when it appears from the pleadings, depositions, answers to interrogatories, admissions, stipulations of fact, and any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Thus, summary disposition is appropriate if, considering all of petitioner's relevant factual allegations as true, the petitioner is not entitled to relief as a matter of law. *Cf. Crisp v. State* (1987), Ind., 511 N.E.2d 306, 307; *Holliness v. State* (1986), Ind., 494 N.E.2d 305, 306–07. Consequently, as this court reviews the post-conviction court's summary disposition of Tyson's petition, we must assume that all of Tyson's relevant factual allegations are true.

 Tyson also claims the post-conviction court committed reversible error based solely upon the fact that the court summarily denied his petition without affording him the opportunity to reply to the State's motion for summary disposition. If Tyson intended to raise a due process issue with this claim, he failed. The full text of Tyson's argument, "A trial court may not, consistent with due process, grant a substantive motion—particularly one for summary judgment—without even according the opposing party its opportunity to reply," Petitioner's Brief at 16, is insufficient to present a due process issue; it is unsupported by any due process authority or analysis. The issue is not before us. *See* Ind.Appellate Rule 8.3(A)(7).

2. It is unclear whether Tyson is also claiming that D.W.'s parents had their own financial motives to obtain Tyson's conviction. However, the post-conviction record is understandably devoid of any factual allegation supporting any such claim. Under Indiana law, only D.W. would have an action against Tyson based upon his conviction. Also, because D.W. was eighteen at the time she signed the retainer agreement in question, she was legally competent to enter into her own contracts.

Tyson's conviction. Because both prongs of Tyson's argument must meet the same component of due diligence, we examine them together.[3]

 The post-conviction court's summary denial of Tyson's petition was proper because the record shows, as a matter of law, that Tyson did not exercise due diligence to discover the evidence before trial. Motions for a new trial based on newly discovered evidence are subject to a "hostile inference of want of [due diligence] in absence of a clear showing to the contrary." *Fuller v. State* (1937), 213 Ind. 144, 150, 10 N.E.2d 594, 596. "A finding of due diligence does not rest upon abstract conclusions about, or assertions of, its exercise but upon a particularized showing that all the methods of discovery reasonably available to counsel were used and could not uncover the newly-found information." *Lyles*, 576 N.E.2d at 1349 (citations omitted); *see also Bradburn v. State* (1981), Ind., 425 N.E.2d 144, 146 (where defendant conducted no discovery with respect to a "newly discovered" witness and made no attempt to subpoena him, it cannot be said that the defendant used due diligence to discover the evidence prior to trial).

Tyson claims that evidence proving D.W. and her family had financial motives to obtain a criminal conviction was the "'smoking gun' that the defense lacked at trial." Petitioner's Brief at 14. In fact, Tyson asserts that "had the jury had any inkling that [D.W.] and her parents had visions of civil damage awards and book and movie projects dancing in their heads,

the chance of a conviction would have been virtually nil." *Id.* at 48. In light of the importance of this evidence to Tyson's defense, he claims that "a virtually herculean effort by the defense to expose the nature of the Washingtons' relationship with their civil lawyers" was made. *Id.* at 41. An examination of the record, however, proves otherwise.

D.W.'s deposition and trial testimony establish that, without question, Tyson knew a professional relationship existed between D.W. and Gerstein. For example, in her December 20, 1991, deposition, D.W. responded as follows to questions propounded by Tyson:

Q. Have you hired a lawyer in connection with this case?

A. Yes.

Q. Who have you hired?

A. Edward Gerstein.

 * * * * * *

Q. And did you yourself retain Mr. Gerstein?

A. With the help of my family.

 * * * * * *

Q. What did you hire him to do?

A. To advise me, to help me through this.

PCR Record at 147. The record of Tyson's trial reveals Tyson shared this information with the jury during his opening statement. Tyson's trial counsel pointed to Gerstein in the courtroom and stated:

Now one of the interesting things about the money motive here is when [D.W.]

---

3. We combine the two prongs of Tyson's argument because, under Indiana law, the same standard applies to both. Tyson urges us to adopt the standard enunciated in *Larrison v. United States* (1928), 7th Cir., 24 F.2d 82, 87–88. *Larrison* and its progeny hold that, when a claim of newly discovered perjured testimony is made, a new trial should be granted if

(a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury *might* have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it for it did not know of its falsity until after the trial.

*Id.* (emphasis in original). Most federal courts and several state courts have followed the *Larrison* rule in cases involving perjured testimony. 2 C. Wright, Federal Practice and Procedure: Criminal 2d § 557.1, at 343 & n. 14 (1982). However, this court and our supreme court have consistently applied the nine-part test both to cases involving perjury and cases involving other types of newly discovered evidence, and we are not free to disregard this precedent. *See, e.g., Watkins v. State* (1988), Ind., 528 N.E.2d 456, 460; *Downs v. State* (1985), Ind., 482 N.E.2d 716, 718–19; *Strain v. State* (1990), Ind.App., 560 N.E.2d 1272, 1274, *trans. denied.*

returns to Rhode Island, one of the very first things she does is hire a lawyer, Edward Gerstein by name, and Mr. Gerstein hires a lawyer in Indianapolis. They have been with this case ever since. In fact, they're here today in the audience, following this case with great intensity. Why? Because if Mr. Tyson were convicted, these lawyers could bring a lawsuit on behalf of [D.W.] that stands to make her a very wealthy woman.

Record at 2962. Tyson's trial counsel also cross-examined D.W. about her financial arrangement with Gerstein.

From the information Tyson gathered from D.W., the post-conviction court had no choice but to determine that Tyson reasonably should have suspected, if not assumed, that a written agreement existed documenting the nature and scope of D.W.'s relationship with Gerstein, and due diligence required that he specifically question D.W. about its existence and content and either subpoena the document or request its production.[4] Nevertheless, the trial record reveals that Tyson failed to take advantage of available discovery procedures to require D.W., Gerstein, or his local counsel to produce documents relating to any agreement D.W. had with any of these attorneys. Neither did Tyson attempt to subpoena any such documents.

Moreover, despite Tyson's knowledge of the professional relationship, and even though he claims D.W.'s financial motive to falsely accuse him of criminal conduct would have been a critical aspect of his defense had he known of it, the trial record reveals that Tyson failed to ask D.W., point blank, any number of questions on the subject. For example, Tyson did not ask D.W. if she expected to receive any monetary benefits from her experience; if she had retained Gerstein to pursue a civil suit; if she had any written agreement with Gerstein; if she had contemplated bringing a civil suit; if she had the present intent to sue Tyson; if she had discussed selling her media rights with anyone; if she wanted to sell or had contemplated selling her media rights; or if she believed she could exploit her experiences with Tyson in any other way.

Based upon Tyson's failure to take advantage of the reasonable avenues available to him, even though he unquestionably knew that D.W. had retained private counsel and also knew that his indictment had garnered international attention creating the possibility of media exploitation, the post-conviction court did not err when it concluded that Tyson did not use due diligence to discover the evidence which he now claims is newly discovered.

Nevertheless, Tyson argues that his lack of diligence should be excused because D.W. and her parents, in their depositions and at trial, testified perjuriously, falsely, or misleadingly in order to obscure his ability to discover the family's financial motives. In particular, Tyson claims he was unable to put the "critical fact" before the jury that D.W. had consulted Gerstein "with a view towards instituting a civil action against Tyson" because "[t]he Washingtons took the position, at their depositions and before the jury at trial, that Gerstein ... was retained *only for defensive purposes*...." Petitioner's Brief at 3–4 (emphasis in original). However, the post-conviction court properly concluded

---

**4.** Ind.Professional Conduct Rule 1.5 states, in part:

(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

(c) ... A contingent fee agreement shall be in writing....

From this rule, Tyson's trial attorneys had good reason to infer from the fact that D.W. retained Gerstein's services that she also probably signed a written fee agreement. Further, Tyson's appellant attorney, Alan Dershowitz, asserts that "Mr. Gerstein, in accordance with his duties as a lawyer, would have fully explained to his clients the nature of a contingency fee agreement before asking that such an agreement be signed." PCR Record at 117. However, he does not explain why Tyson's trial counsel did not infer from the attorney-client relationship that Gerstein, likewise in accordance with his duties as a lawyer, would not have required D.W. to enter into a written fee agreement with him when she retained him.

that the testimony of D.W. and her parents was not perjurious or false as a matter of law due to the ambiguous and unfocused nature of the questions posed.[5]

5. In support of Tyson's claim that D.W. perjured herself, he points to two exchanges that occurred in D.W.'s deposition and trial testimony. At deposition, D.W. responded as follows to the questions posed by Tyson:

Q. Have you hired a lawyer in connection with this case?
A. Yes.
Q. Who have you hired?
A. Edward Gerstein.

\* \* \* \* \* \*

Q. And did you yourself retain Mr. Gerstein?
A. With the help of my family.
Q. What is the scope of his representation of you?
A. Could you rephrase that, please.
Q. What did you hire him to do?
A. To advise me, to help me through this.
Q. Do you pay Mr. Gerstein?
[Objection by Mr. Garrison]

\* \* \* \* \* \*

Q. Have you sent him any money?
A. No.
Q. Has he sent you any bill?
A. No.

PCR Record at 147–48.

At Tyson's trial, during her cross-examination, D.W. responded as follows to Tyson's questions:

Q. Mr. Gerstein is a Providence, Rhode Island, lawyer?
A. Yes.
Q. And he's been with you here since you came to Indianapolis to testify in the trial?
A. Yeah.
Q. And he's been helping you through this process?
A. Sort of, I guess.
Q. He's been in court from time to time, hasn't he?
A. In court?
Q. He's been in the courtroom?
A. No, he hasn't been in here. I didn't give him one of my passes to come in here, so he couldn't.
Q. Do you know whether he's been able to watch these proceedings from some other place in the building?
A. No, I don't think he is.
Q. Did you visit with Mr. Gerstein last evening?
A. No.
Q. Mr. Gerstein and Mr. Hennessy attended your deposition last December here in Indianapolis, did they not?
A. Yes. Yes.
Q. Mr. Gerstein came here from Providence and Mr. Hennessy is a local lawyer?
A. Yes.
Q. Do you know what financial arrangement you have with Mr. Gerstein in representing you?
A. No.
Q. You have no idea whatsoever?

A. No. He never said anything like that. He just said that he'd help us with the media and that, you know, when it was over, I guess my parents are going to pay him back little by little.
Q. You think he has some retainer agreement with your parents?
A. Some—
Q. —you think he has some retainer arrangement with your parents?
A. I don't know what "retainer" means.
Q. You think he has some fee arrangement with your parents?
A. I don't know.
Q. Have you heard them explain or discuss with you a contingent fee?
A. What's "contingent" mean?
Q. A fee payable only on the contingent that he's successful in some way.
A. No. The only thing I know that they have to pay is for his flights out here.
Q. His expenses.
A. Yes.
Q. They're not liable to pay him anything else?
A. I don't know what else they pay him.
Q. Mr. Gerstein came out here to Rhode Island—I'm sorry—came out here to Indianapolis when you were out here last August to come to the grand jury as well, did he not?
A. I don't even remember. Yeah, he did come out here for that.

Trial Record at 3349–51. In neither of these exchanges did D.W. deny she had a written agreement with Gerstein or that she intended to sue or had considered suing Tyson, or for that matter, that she intended or had considered selling the media rights to her story and discussed the matter with Gerstein; she was never asked a question which addressed these issues.

Rather, the questions posed to D.W. dealt with and focused on Gerstein's role during the criminal proceeding, including the fact that he came to Indianapolis from Rhode Island for her deposition and for the criminal trial. For example, Tyson asked in regard to D.W.'s relationship with Gerstein whether: "he's been with you here since you came to Indianapolis to testify in the trial?," *id.* at 3349; "he's been helping you through this process?," *id.;* "he came out here to ... Indianapolis when you were out here ... to come to the grand jury as well ...?," *id.* at 3351; "[h]e's been in court from time to time, hasn't he?," *id.* at 3349; "[d]id you visit with Mr. Gerstein last evening?," *id.* at 3350; "Mr. Gerstein ... attended your deposition last December here in Indianapolis, did [he] not?," *id.* at 3350.

Thus, a reasonable construction of the questions propounded to D.W. is that they related to Gerstein's legal services in assisting D.W. during the criminal proceeding. None of defense counsel's questions referred to a potential civil proceeding, or Gerstein's potential representation of D.W. in the future.

In support of his claim that D.W.'s mother, Mary Belle Washington, committed perjury, Tyson refers to Mrs. Washington's deposition testimony which is as follows:

Q. Are you represented by counsel here today?

A. Yes, I have an attorney.

Q. Will you identify him for us.

A. Mr. Gerstein, Ed Gerstein.

Q. He's your counsel?

A. He's our family counsel.

Q. How long has he been your family counsel?

A. Since the beginning of the case, July of 1991.

\* \* \* \* \* \*

Q. And Mr. Gerstein represents you, your husband and your daughter [D.W.]; is that correct?

A. Yes, he's representing our family.

Q. And you also have an attorney in Indianapolis by the name of Henderson [sic]?

A. Yes.

Q: Have these lawyers been retained by you and your family?

A: Basically, yes.

Q: You paid them fees?

A: No, I wouldn't know of any fees. There haven't been any fees mentioned.

Q: Is your arrangement with these lawyers what's called a contingency?

\* \* \* \* \* \*

A: I don't understand what you're saying.

Q: Well, is your arrangement with your lawyers contingent upon their success in representing you?

Mr. Garrison: Mr. Fuller, one preliminary question, if I might.

(To the deponent) Have there been discussions between your lawyers and your family relative to the lawyers being compensated for their services?

The deponent: No.

Mr. Garrison: There have been none?

The deponent: No.

\* \* \* \* \* \*

Q: Is there any written document relating to the relationship between you and Mr. Gerstein?

A: No.

PCR Record at 151–54.

The existence of a retainer agreement between D.W. and Gerstein does not make any of Mrs. Washington's answers perjurious. Mrs. Washington did not deny that D.W. had signed an agreement with Gerstein; Mrs. Washington only denied the existence of any written document establishing a relationship between herself and Gerstein. Tyson failed to specifically and directly inquire about D.W.'s financial motives or the existence of an agreement between D.W. and Gerstein when he deposed Mrs. Washington and when he examined her at trial. Nor did Tyson inquire of Mrs. Washington regarding any knowledge she might have had regarding D.W.'s intent or expectation to exploit her story or what she believed D.W.'s beliefs were relating to the criminal court jury's ability to award her money damages if it found Tyson guilty as charged.

With respect to Tyson's claim that Mr. Washington committed perjury, we note that he responded as follows to Tyson's direct examination:

Q. Now, Mr. Washington, did there come a time that you engaged an attorney by the name of Edward Gerstein?

A. Yes, I did.

Q. Why did you retain Mr. Gerstein?

A. For media purposes, to help ward off the media.

Q. Was Mr. Gerstein present during your deposition?

A. Which deposition are you talking about?

Q. Do you recall giving a deposition in this action in, I guess, January of this year?

A. Yes.

Q. Was the media present for that?

A. No, the media was not present.

Q. Was Mr. Gerstein present for that?

A. Yes, he was.

Q. And was Mr. Gerstein also present for the depositions of your daughter and son and wife?

A. I don't know. I wasn't there.

Q. And did Mr. Gerstein accompany you when you came to testify before the grand jury in this case?

A. At the present time?

Q. No, earlier, last, I think—do you recall testifying before the grand jury in this case last September?

A. Yes.

Q. Did Mr. Gerstein accompany you from Rhode Island here on that occasion?

A. Yes, he did.

Q: Are you liable to pay Mr. Gerstein his expenses?

A: Yes.

Q: Do you have a contingency fee arrangement with him?

A: I don't understand what you mean by contingency agreement.

Q: Do you have a fee arrangement with him?

A: To pay his expenses.

Q: And anything else?

A: Nothing else, just his expenses so far.

Q: That's your agreement so far?

A: Yes.

\* \* \* \* \* \*

Q: Do you know—do you know whether or not your daughter can sue Mike Tyson civilly based on the allegations that she's brought here?

A: We haven't crossed that path yet. We're trying to get this criminal case first—you know I'm not sure what—I don't understand what you're talking about.

Q: She could bring a civil case based on the charges that she leveled against Mr. Tyson, right, she could sue him for damages?

A: She hasn't got through the criminal case yet.

Similarly unavailing is Tyson's claim that the testimony of D.W. and her parents was misleading. The fact is that D.W. and her parents did not volunteer any information in answering the questions propounded to them; they merely responded literally to the questions as phrased. If Tyson was misled by the character of their answers, it was due to the unfocused and ambiguous phrasing of the questions propounded to them rather than any guile in their answers, particularly considering the fact that Tyson unquestionably knew that D.W. had retained Gerstein and, therefore, had the basic information he needed to frame focused and explicit questions.

In conclusion, the post-conviction court did not err when it determined that, as a matter of law, Tyson did not exercise due diligence with reference to the claimed newly discovered evidence. Neither did it err when it determined that, as a matter of law, Tyson was not dissuaded from exercising due diligence by perjurious, false, and misleading deposition and trial testimony of D.W. and her family.

## II.

■ Tyson argues that he is entitled to post-conviction relief because the prosecutor failed to disclose exculpatory information required by *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Specifically, Tyson alleges that "the prosecutors were aware of the full scope of the Washingtons' relationship with their lawyers and their contemplation of a civil action, and failed to provide this information to the defense." Petitioner's Brief at 33.

In response, the State argues that Tyson makes his claim "without any discernable [sic] factual basis." Respondent's Brief at 36. Necessarily, this argument fails because the post-conviction court's summary denial of Tyson's petition requires that his factual allegations be accepted as true. Therefore, in considering this assertion of error, we must assume that a factual basis exists for Tyson's assertion of the scope of D.W.'s relationship with her attorneys and that it included the possibility of a civil action.

■ On September 13, 1991, Tyson requested "[a]ll material or information within the State's possession or control which ... tends to impeach the credibility of any witness in this matter." Record at 173. "It is well founded that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment irrespective of the good or bad faith of the prosecution." *House v. State* (1989), Ind., 535 N.E.2d 103, 106 (citing *Brady*, 373 U.S. at 83, 83 S.Ct. at 1194). The United States Supreme Court has held that the prosecution's obligation under *Brady* applies to impeachment evidence as well as exculpatory evidence, because it is " 'evidence favorable to the accused' ... so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley* (1985), 473 U.S. 667, 675, 105 S.Ct. 3375, 3379–80, 87 L.Ed.2d 481 (quoting *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97); *see also Napue v. Illinois* (1959), 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."). However, the failure to disclose requested impeachment evidence requires reversal

---

Q: So that's something she will consider later?
A: I don't know.
PCR Record at 171–74.

Again, the fact of the existence of a retainer agreement between D.W. and Gerstein is not controverted by any of Mr. Washington's answers. Moreover, his testimony clearly leaves open the possibility of D.W. bringing a civil suit

against Tyson and therefore cannot be categorized as so misleading as to discourage Tyson from pursuing the matter further. And, as with Mrs. Washington, Mr. Washington was not asked anything about D.W.'s plan to exploit her story or his knowledge of D.W.'s monetary expectations from the criminal court proceedings.

Thus, the post-conviction court did not err when it found, as a matter of law, that neither D.W. nor her parents committed perjury.

only if there is a reasonable probability that the result of the trial would have been different if the evidence had been made known to the defendant. *House*, 535 N.E.2d at 107 (citing *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383–84).

Whether the State knew of D.W.'s alleged financial motives, whether it failed to disclose material or information concerning those alleged motives, and whether there is a reasonable probability that any undisclosed material or information would have affected the jury's verdict, are questions of fact for the fact finder and, accordingly, are questions which this court cannot answer. Thus, Tyson must be afforded an evidentiary hearing at which he will have the burden of proving that the State knew of facts which were impeaching and failed to disclose them to Tyson, and, in addition, that there is a reasonable probability that this information or material, had it been produced, would have affected the outcome of the trial. Because the post-conviction court's summary denial of his petition denied Tyson this opportunity, we must remand this cause to the post-conviction court for the limited purpose of affording Tyson a hearing at which he will have the opportunity to meet his burden of proof by a preponderance of the evidence.

Judgment affirmed in part, reversed in part, and this cause remanded to the post-conviction court for further proceedings consistent with this opinion.

ROBERTSON, J., concurs.

SULLIVAN, J., concurs, with separate concurring opinion.

SULLIVAN, Judge, concurring.

While I agree that Tyson's counsel failed to use reasonable diligence to discover the full details of the retainer agreement between D.W. and Edward Gerstein, I am unable to agree with the majority that the testimony of D.W. and her parents was not misleading. Although perhaps many of the various answers given with respect to the relationship with Gerstein were literal responses to the questions as phrased, and although the witnesses certainly had no duty to volunteer information, in light of the facts known by the witnesses, the answers were misleading.

D.W.'s answers carried the clear implication that Gerstein was retained only to "help me through this" (Maj.Op. at 487), i.e., the criminal trial, and that when the trial was over, her parents would pay him. Maj.Op. at 487. Additionally, she belied the fact that *she* was the client when she testified that Gerstein was counsel for the family. More importantly, when asked whether there had been any discussions between Gerstein and the family concerning compensation, she unequivocally said: "No." Record at 154.

Mrs. Washington testified that Gerstein was counsel for the family but that there was no written agreement relating to the relationship. In light of the fact that Mrs. Washington was a signator to the retainer agreement between D.W. and Gerstein, that answer was also misleading.

Mr. Washington, also a signator to the agreement between D.W. and Gerstein, stated that he had retained Gerstein's services but categorically stated that the purpose was "to help ward off the media". Maj.Op. at 488. He also denied that any consideration whatsoever had been given to the possibility of a civil suit against Tyson. Maj.Op. at 488. Further, he denied that he had a contingency fee agreement with Gerstein and stated that his only agreement was to pay expenses. Again, in the context of the facts, the natural and logical implication of the testimony of all three witnesses was that there was no contingent fee agreement with Gerstein with regard to representation in civil proceedings.

In point of fact, the retainer agreement was entered into and signed on August 1, 1991. Although Donald C. Washington and Mary B. Washington were signators, as well as D.W., the agreement clearly states that D.W. is the only client—not the "family" and not Mr. and/or Mrs. Washington. It also clearly spells out that the purpose of the agreement is *not* to get D.W. or the family through the criminal trial or to "ward off the media," but rather was to procure legal representation regarding pos-

sible civil liability on the part of Tyson and others as a result of the "incident" of July 19, 1991.

If the information given by these witnesses were the only information available to defense counsel, the deposition and trial answers would have been sufficiently misleading as to indicate that further inquiry or issuance of a subpoena duces tecum would be wasteful and unavailing.

Be that as it may, it is clear that at least as of September 9, 1991, the date of Tyson's indictment by the grand jury, defense counsel knew that D.W. and/or her family had retained the services of Gerstein. Counsel was also aware that financial offers large enough to pay for college had been received from persons wishing rights to D.W.'s story. Furthermore, before and during trial Tyson sought to elicit facts to show that D.W. had a financial stake in the criminal prosecution. It is clear, as noted by the majority, that based upon knowledge already possessed, trial counsel simply did not ask the right questions. This lack of due diligence defeats Tyson's "newly discovered evidence" argument. I concur in the conclusion of the majority opinion in Part I that the trial court did not err in denying relief upon this ground.

I also concur in Part II of the majority decision which remands the matter to the post conviction court for a hearing as to the prosecution's failure to divulge, upon request, exculpatory or impeaching evidence.

I note with interest, however, that in reaching its conclusion, the majority places considerable emphasis upon the well-established principle that the defendant is entitled to "impeachment evidence as well as exculpatory evidence, because it is 'evidence favorable to the accused'.... so that, if disclosed *and used effectively*, it may make the difference between conviction and acquittal.", and upon the principle that " 'The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence'...." Maj.Op. at 489 (emphasis supplied).

This acknowledgment seems somewhat anomalous, in light of the majority holding in *Tyson v. State* (1993) 2d Dist. Ind.App., 619 N.E.2d 276, which found no error in exclusion of evidence because "as impeaching evidence, the excluded testimony is cumulative...." 619 N.E.2d at 287. The majority upheld the trial court's view that the evidence "was not vital to Tyson's defense". *Id.*

I find it somewhat difficult to reconcile the two positions taken by the majority although they consider evidentiary principles in different contexts, i.e., a trial court's discretionary evidentiary ruling in the first instance and failure of the prosecution to disclose evidence in this instance. Nevertheless, as postulated in my separate dissent in the earlier *Tyson* case, the excluded evidence might well have made the difference between conviction and acquittal. Here the majority acknowledges that similar evidence may not be summarily viewed as unimportant. The majority, in quoting from *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, clearly acknowledges that evidence, even if merely impeaching, is favorable to the accused and that a defendant is entitled to use it effectively, unless for some other reason the evidence is inadmissible.

Subject to this observation and to my view that D.W. and her parents gave misleading testimony, I concur.