**John ROWE, Appellant–Petitioner,**

**v.**

**STATE of Indiana, Appellee–Respondent.**

**No. 84A05–9710–PC–425.**

Court of Appeals of Indiana.

Jan. 29, 1999.

---

Monica Foster, Hammerle Foster Allen & Long–Sharp, Indianapolis, for Appellant–Petitioner.

Jeffrey A. Modisett, Attorney General, Rosemary Borek, Deputy Attorney General, Indianapolis, for Appellee–Respondent.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Defendant John Rowe ("Rowe") appeals the denial of his petition for post-conviction relief from his convictions, after a jury trial, of Murder, a felony, and two counts of Attempted Murder, class A felonies.[1] We reverse.

---

1. IND.CODE § 35–42–1–1 (Murder, a felony); IND. CODE § 35–41–5–1(a) (Attempt—Attempted Murder is a class A felony).

### Issue

The dispositive issue may be restated as whether there is a reasonable probability that the result of Rowe's trial would have been different had the State disclosed that one of its key witnesses had previously been convicted of Burglary and Theft.

### Facts/Procedural History

On July 9, 1986, Rowe, age eighteen, shot his parents and his sister. *Rowe v. State,* 539 N.E.2d 474, 475–76 (Ind.1989). Rowe's father and sister survived, but Rowe's mother died. *Id.* at 476. Rowe raised the defenses of insanity and voluntary intoxication arguing that he was not responsible due to an organic brain disorder and/or drug-induced, toxic psychosis resulting from chronic drug abuse and/or the ingestion of a large quantity of stimulants just before the shooting. *Id.* at 479; (R. 1017, 1026, 1404–07, 1457, 1468).[2]

Rowe testified that he had used marijuana, Demerol intravenously ("IV"), "crank," cocaine, "acid," and other illegal drugs extensively since he was thirteen years-old.[3] (R. 962–67, 972, 1046). Rowe testified that he began injecting cocaine and "crank" at age fifteen. (R. 969, 972). Rowe began smoking "crack" cocaine in early 1985. (R. 970). Rowe had been disciplined in high school for using drugs. (R. 229). Rowe was discharged from the Marines for using drugs. (R. 230). Rowe had embezzled approximately $27,000.00 from his father's business in order to buy drugs. (R. 896, 925–26, 941, 958). Rowe had been committed to a psychiatric hospital in the fall of 1985. (R. 228, 231, 519, 925, 979, 1061, 1393).

Rowe testified that his lover/roommate, Stefan Hodges ("Hodges"), was also a long-term IV drug user. (R. 954, 986). Rowe testified that he and Hodges had gone on a "coke binge" and had ingested large quantities of drugs and alcohol the weekend before the shooting. (R. 954, 980, 982–1004). Rowe testified that they used alcohol, cocaine, mar-

ijuana, and crank that weekend. (R. 987, 991, 993, 995–96, 1009–10).

Rowe testified, and reported to his physicians, that he had taken a pill described as "Eve" and had injected five to ten grams of cocaine shortly before the shooting. (R. 1005, 1017–18, 1461). Rowe testified and reported that after he got to his parents' house, he began to have visual and auditory hallucinations, did not remember the shooting, and had not intended to kill any of the victims. (R. 1026, 1028, 1187, 1521). One of Rowe's experts testified that Rowe's description of his experience was "classic" for "cocaine toxic psychosis." (R. 1483).

Rowe's sister gave the following testimony about Rowe's appearance and behavior immediately before the shooting:

> When I saw John, he—his eyes were as glossy as glass, his cheekbones were clenched, he had a really weird expression on his face. His eyes were just they're glaring. It didn't look like John. I mean, he just—it was—you know, he just—the way he just looked, with his eyes, you know, he just—it didn't look like John.

(R. 906). Rowe's aunt testified that Rowe's mother was quite concerned about him because he had changed shortly before the shootings. (R. 881). Rowe's mother had said "the John we knew is gone." (R. 882). Rowe's father's friend testified that he was surprised to learn about the shooting because he had known the family for twelve years and Rowe was "one of the perfect kids." (R. 897).

The State rebutted Rowe's defenses by contesting his claim that he had taken a large quantity of drugs before the shooting. (R. 1155–56, 1195–96, 1201, 1327, 1347). Rowe's psychiatric experts conceded that the validity of their opinions depended upon the accuracy of Rowe's report that he had injected a large quantity of drugs before the shooting. (R. 1330, 1427, 1436, 1440, 1492–93).

---

**2.** The transcript of the original criminal proceedings will be referred to as "R." The transcript of the post-conviction proceedings will be referred to as "PCR."

**3.** At trial, a physician identified:

(1) Demerol as a prescription narcotic pain killer derived from opium;

(2) "Crank" as a form of amphetamine;

(3) "Acid" as Lysergic Acid Diethylamide ("LSD");

(4) "Crack" as the free-base form of cocaine.

(5)"Eve" as probably being Methylene Dioxe Amphetamine, a synthetic stimulant hallucinogen.

(R. 1390, 1400–01).

Hodges gave the most testimony of all of the State's witnesses, filling 120 pages of the transcript. (R. 708–828). Hodges contradicted Rowe's testimony by denying that he had a drug habit or had ever ingested crack or crank. (R. 769). Hodges contradicted Rowe further by testifying that they had not taken any drugs together during the weekend before the shooting. (R. 712, 720–21, 773, 779, 780–81, 791). Additionally, Hodges testified that when he saw Rowe shortly after the shooting, he did not appear to be intoxicated on drugs or alcohol. (R. 742, 755, 820). Hodges also testified that Rowe had pointed a gun at him on two occasions. (R. 762). Finally, Hodges testified that he did not want to testify against his lover but had been subpoenaed by the State. (R. 767).

The State repeatedly emphasized the portion of Hodges' testimony in which he stated that Rowe did not use drugs extensively during the weekend prior to the shooting. (R. 1556, 1630, 1730–32). The State also emphasized Hodges' testimony that Rowe did not appear to be intoxicated on drugs after the shooting. (R. 1733–34). The State argued that Hodges, as Rowe's lover, had no reason to testify falsely against Rowe. (R. 1730).

Before trial, Rowe had filed two written motions for production which had specifically requested the State to disclose the arrest and criminal records of its witnesses. (R. 63, 96). The State certified that it had complied with Rowe's discovery requests. (R. 72). However, the State did not disclose that Hodges had a criminal record. (R. 72).

Rowe was convicted of Murder and two counts of Attempted Murder and was sentenced to an aggregate term of 100 years. (R. 223; PCR. 84). Rowe's convictions were affirmed on direct appeal. *Rowe*, 539 N.E.2d 474. In rejecting Rowe' insanity and intoxication defenses on appeal, our supreme court noted:

> [Rowe's expert] acknowledged his opinion that appellant was unable to form intent was based on the veracity of appellant's own account of his copious drug abuse prior to the shootings and that his diagnosis would be incorrect if appellant's account were not accurate. Significantly, none of the witnesses testifying as to appellant's behavior during the hours and

days prior to the shootings could confirm his own account of prodigious drug abuse. *Id.* at 479.

The present post-conviction petition was filed in 1990. (PCR.14). During the post-conviction proceedings, Rowe learned that Hodges had been convicted of Burglary and Theft in 1982 and had been on probation at the time of the shooting and trial. (PCR.35). In fact, Hodges had been arrested in December of 1986 in connection with probation revocation proceedings pending against him. (PCR.358). Hodges testified for the State in Rowe's trial in March of 1987. (R. 345).

### Discussion and Decision

Rowe contends that the State's failure to disclose Hodges' criminal record denied him a fair trial because the convictions could have been used to impeach Hodges' credibility. The State effectively concedes error, but argues that reversal is unwarranted because "Hodges was not a critical witness, and [Rowe] would have been found guilty without his testimony." (Appellee's brief at 17).

### A. Standard of Review for Post–Conviction Relief

As recently stated in *Miller v. State*, Ind. No. 64S00–9408–PC–00742 (December 8, 1998):

> A person convicted of, or sentenced for, a crime by a court of this state has a constitutional right to appeal that conviction or sentence directly to either [the supreme court] or the Court of Appeals. Ind. Const. art. VII, §§ 5 & 6. As stated above, [the defendant] exercised his right to a direct appeal and [the supreme court] affirmed his convictions. After such an appeal, Indiana law permits the person to seek 'post-conviction relief' through a special, quasi-civil action in certain circumstances and under certain conditions. Ind. Post–Conviction Rule 1(1). *See Lowery v. State*, 640 N.E.2d 1031, 1036 (Ind.1994) (post-conviction remedy not substitute for appeal), *cert. denied*, 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995); *Weatherford v. State*, 619 N.E.2d 915, 916 (Ind. 1993) (post-conviction procedures do not provide 'super appeal').

To the extent that a person seeking post-conviction relief (usually referred to as the 'petitioner') has been denied relief by the post-conviction court, the petitioner appeals from a negative judgment. This is because at the trial on the petition for post-conviction relief, the petitioner has the burden of establishing any grounds for relief by a preponderance of the evidence. P–C.R. 1(5). Such is [defendant's] situation here. When a petitioner appeals from a negative judgment, he or she must convince the appeals court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the trial court. [The appeals court] will disturb a post-conviction court's decision as being contrary to law only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion.

(Slip op. at 2–3) (some citations omitted).

### B. Felon Witness Testimony

 The credibility of a felon-witness is highly suspect. *Ferguson v. State*, 670 N.E.2d 371, 374 (Ind.Ct.App.1996), *trans. denied.* The jury's estimation of the truthfulness and reliability of a witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Ferguson*, 670 N.E.2d at 374. The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In *Davis*, the United State's Supreme Court reversed a criminal defendant's conviction where he was wrongfully denied the opportunity to cross-examine one of the State's witnesses regarding his status as a probationer. *Id.* at 321, 94 S.Ct. 1105. The *Davis* court held that "[t]he claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the witness'] vulnerable status as a probationer." *Id.* at 318–19, 94 S.Ct. 1105.

### C. Prior Convictions as Impeachment Evidence

 Under Indiana's common law, a prior conviction may be used for impeachment if it involved dishonesty or false statement or constituted one of the "infamous crimes." [4] *Bryant v. State*, 660 N.E.2d 290, 301–02 (Ind. 1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 293, 136 L.Ed.2d 213; *Ashton v. Anderson*, 258 Ind. 51, 279 N.E.2d 210, 217 (1972). Hodges' Burglary and Theft convictions would both have been admissible as crimes which involve dishonesty and reflect upon a witness' credibility for truth and veracity. *See Garner v. State*, 274 Ind. 675, 413 N.E.2d 584, 585 (1980) (Burglary), *denial of post-conviction relief reversed*, 550 N.E.2d 1309, *trans. denied; Geisleman v. State*, 274 Ind. 241, 410 N.E.2d 1293, 1296 (1980) (Theft).

### D. Suppression of Exculpatory Evidence

 The suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995); *House v. State*, 535 N.E.2d 103, 106 (Ind.1989), *dismissal of habeas corpus affirmed*, 142 F.3d 439. The State has an affirmative duty to disclose evidence favorable to the defense. *Kyles*, 514 U.S. 419, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490; *Johnson v. State*, 693 N.E.2d 941, 946 (Ind.1998). This duty of the State to disclose extends to evidence which can be used to impeach the State's witnesses. *Bagley*, 473 U.S. at 676–77, 105 S.Ct. 3375; *Marshall v. State*, 621 N.E.2d 308, 315 (Ind.1993); *Tyson v. State*, 626 N.E.2d 482, 489 (Ind.Ct.App.1993), *cert. denied*, 510 U.S. 1176, 114 S.Ct. 1216, 127 L.Ed.2d 562 (1994). The failure of the prosecution to honor the requests of the defense for evidence, for which a substantial basis for

4. The common law applies here because the present case arose before the Indiana Rules of Evidence were adopted. *See Bryant*, 660 N.E.2d at 301–02 n. 23 (evidence rules adopted January 1, 1994). However, Hodges' convictions would have been admissible under Ind. Evidence Rule 609.

claiming materiality exists, is seldom, if ever excusable. *Bagley,* 473 U.S. at 681, 105 S.Ct. 3375; *Richard v. State,* 269 Ind. 607, 382 N.E.2d 899, 903 (1978).

■ Suppression of material, favorable evidence will result in constitutional error if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles,* 514 U.S. 419, 115 S.Ct. at 1566. The touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. *Id.* This showing of materiality does not require the defendant to demonstrate by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. *Id.; Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. As stated in *Kyles,* 514 U.S. 419, 115 S.Ct. at 1566:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

(citations omitted; quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375); *Johnson,* 693 N.E.2d at 946; *Turner v. State,* 684 N.E.2d 564, 568 (Ind.Ct.App.1997), *trans. denied.*

### E. Reasonable Possibility of Different Outcome

■ In the present case, Hodges was presented by the State as a witness who was reluctant to testify against Rowe because of their intimate relationship. Hodges' testimony was devastating to Rowe's insanity and intoxication defenses because it directly contradicted Rowe's testimony and the history relied upon by his experts regarding his habitual drug use and the injection of large quantities of drugs on the day of the shooting. However, Hodges had a significant incentive for failing to corroborate Rowe's testimony. If Hodges had corroborated Rowe's testimony regarding their use of illegal drugs, Hodges would have provided the State with all the evidence necessary to revoke his probation. *See Jaynes v. State,* 437 N.E.2d

137, 139–40 (Ind.Ct.App.1982) (the commission of any criminal offense is sufficient to warrant the revocation of probation). Moreover, considering that probation revocation proceedings were already pending against Hodges, Rowe should have had an opportunity to explore whether Hodges expected favorable treatment in exchange for his testimony. *See Ferguson,* 670 N.E.2d at 376 (conviction for Murder reversed under circumstances in which defendant was denied an adequate opportunity to explore whether the State had reached an understanding regarding leniency with one of its witnesses where her testimony would have subjected her to criminal prosecution).

The State argues that the error was harmless because Hodges' credibility was impeached in other respects. We disagree. In *Poore v. State,* 501 N.E.2d 1058, 1062 (Ind. 1986), the credibility of the felon-witness had been impeached with evidence of his extensive criminal record as well as the favorable plea agreement he had entered into in exchange for his testimony. Nevertheless, our supreme court held that the erroneous exclusion of a prior inconsistent statement which would have further impeached this witness' credibility required reversal where defendant's conviction rested substantially upon this witness' credibility. *Id.*

Similarly, in the present case, the suppression of Hodges' criminal record undermines confidence in the outcome of the trial because Rowe's intoxication and insanity defenses were completely hamstrung by Hodges' testimony. Based on the above, we conclude that Rowe has demonstrated a reasonable probability that the result of the trial would have been different had the State disclosed the evidence of Hodges' criminal record in response to Rowe's discovery request.

### Conclusion

Rowe has carried his burden of demonstrating that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. Therefore, we reverse and remand with instructions that Rowe's post-conviction petition be granted, that his convictions be

reversed, and that the matter be set for a new trial.

Reversed.

NAJAM, J., and SHARPNACK, C.J., concur.